Sean M. SISSON, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 319, 2005.

Supreme Court of Delaware.

Submitted: April 12, 2006.

Decided: June 19, 2006.

---

20. *Pauls v. State,* 554 A.2d at 1125; *Robertson v. State,* 630 A.2d at 1093.

Bernard J. O'Donnell (argued) and Nicole M. Walker, Office of the Public Defender, Wilmington, Delaware for appellant.

Thomas E. Brown (argued) and Donald R. Roberts, Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en Banc.

STEELE, Chief Justice.

The defendant appellant, Sean Sisson appeals his convictions for six counts of Sexual Exploitation of a Child. The Delaware State Police executed a search warrant at Sisson's residence and seized Sisson's business computer. On the computer they found several hundred images of child pornography, ten of which depicted Sisson's daughter. Sisson was charged with ten counts of Sexual Exploitation of a Child and various other counts of possessing and dealing in child pornography. Before trial, Sisson moved to suppress the images contending that the affidavit in support of the warrant failed to support a finding of probable cause. Sisson also moved to dismiss nine of the ten counts of Sexual Exploitation of a Child on the ground that they were multiplicitous. The trial judge denied both of these motions. The trial judge did, however, grant Sisson's motion to sever the Sexual Exploitation counts from the other dealing and possessing counts. After a bench trial on the Sexual Exploitation charges, the judge found Sisson guilty on six of the ten counts of Sexual Exploita-

tion of a Child. Sisson ultimately pleaded guilty to two of the other severed counts and the State entered *nolle prosequis* on the remaining charges. Sisson now appeals the denial of his motion to suppress and motion to dismiss. Because the affidavit established probable cause, because Sisson was properly charged with ten counts of Sexual Exploitation, and because the evidence supports his conviction of six counts, we affirm the trial judge's rulings and Sisson's convictions.

## *FACTS*

On March 24, 2004 detectives of the Delaware State Police submitted an application for a search warrant supported by an affidavit of probable cause to a magistrate in J.P. Court. The affidavit included the following information:

1. On March 17, 2004, Your Affiant(s) received information through The National Center for Missing and Exploited Children (NCMEC)[1] that America On Line (AOL), an Internet Service Provider, had discovered an email that depicted a pre-pubescent, possibly Asia [sic], female performing fellatio on an adult white male. The email involved an AOL subscriber with the screen name "letsrolearound" with the email address of letsrolearound@aol.com. The email was discovered, by AOL, on January 2, 2004. AOL provided the Hillsborough County Sheriff's Office, located in the state of Florida, with the picture and screen name of the subscriber. The original file name was "6year_blowbb.jpg". An attachment, to the sent email by "letsrolearound", was identified by

1. *See State v. Sisson,* 883 A.2d 868, 872–73, n. 8 (Del.Super.2005) (*"Sisson I"*) (explaining in detail the NCMEC).

AOL employees as an image depicting child pornography.

2. [A Florida Detective], of the Hillsborough County Sheriff's Office, sent a subpoena to AOL for information involving "letsrolearound". It was discovered that the subscriber for letsrolearound was [the defendant's wife] with an address [in] ... Lutz, Fl[orida].... Sean Sisson [the defendant] (WM: DOB: 02/23/63) was the second bill contact on the AOL account. [The Florida Detective] discovered that [the defendant's wife] and ... Sisson no longer resided in Florida and had a current address [in] ... Hockessin, De.

3. [The Florida Detective] also discovered that [the defendant's wife] and Sean Sisson had two daughters and two sons. In May 2002, the Hillsborough County Sheriff's Office investigated an allegation of child abuse involving Sean Sisson, who was identified as the father of [youngest daughter], and [oldest daughter] ... The allegation involved inappropriate behavior involving [youngest daughter] and her father Sean Sisson. The case was cleared unfounded [sic].

4. Since it was discovered that [defendant's wife] and Sean Sisson now resided in Delaware, [the Florida Detective] forwarded all the information to NCMEC. NCMEC, in turn, forwarded the information to Your Affiant(s).

5. Your Affiant(s) completed a local Delaware license check and found that [defendant's wife and] Sean Sisson ... obtained Delaware Drivers [sic] licenses in 2003. All the licenses have the address ... [in] Hockessin, De.

6. Your Affiant verified that [oldest daughter] and [youngest daughter] attend [a middle school] in Delaware. From [oldest daughter's] school records, she is described as Asian–Caucasian.

7. Your Affiant verified that Sean Sisson is employed by Netvantage Solutions Inc., located in Hockessin Delaware. Your Affiant completed a business check, through the Better Business Bureau, for Netvantage Solutions. The check revealed that the principle [sic] of the business is Sean Sisson. Netvantage Solutions offers intranet development, computer support, and software integration and Internet services and is located at 7454 Lancaster Pike, Hockessin, De.

8. Your Affiant completed a search for 7454 Lancaster Pike ... and found that this address is a Mailboxes Etc. Mailboxes Etc. offers mailboxes "drop boxes" that a person may rent.

The affidavit included background information on email and the use of computers and the internet with child pornography. It also included statements that the DSP detectives made based on their "training and experience" that:

The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.... [U]nder the relevant case law, information in support of probable cause in child pornography cases is less likely to be stale because collectors and traders are known to store and retain their collections for extended periods of time, usually in their home and/or computer [citing cases].

Based on this information, the DSP detectives requested a warrant to search the defendant's residence for evidence of Unlawfully Dealing in Child Pornography and Possession of Child Pornography. A magistrate reviewed the application and authorized the search warrant. The detectives executed the warrant on March 24, 2004, seizing a number of items from the defendant's home, including his business computer. As the trial judge elaborated:

> On this computer, detectives found several hundred pornographic images of prepubescent children engaged in various sex acts with adult males. After being Mirandized, ... Sisson admitted that all of the child pornography on his business computer belonged to him. He also admitted that he transmitted pornographic images of children to other individuals who collect and view these images via the Internet. He further admitted that several of the images on his computer were of his thirteen year old daughter.[2]

Sisson was arrested and charged with ten counts of Sexual Exploitation of a Child,[3] numerous counts of Dealing in Child Pornography[4] and numerous counts of Possession of Child Pornography.[5] Before trial, Sisson moved to suppress the evidence seized pursuant to the warrant on the ground that the affidavit supporting the application for the warrant failed to establish probable cause. The trial judge denied the motion.[6] Sisson also moved to dismiss nine of the ten counts of Sexual Exploitation of a Child as multiplicitous. The trial judge denied this motion as well.[7] The trial judge did, however, grant Sisson's motion to sever the Sexual Exploitation of a Child counts from the other child pornography counts. After a bench trial, the trial judge found Sisson guilty of six of the ten counts of Sexual Exploitation of a Child.[8] Sisson now appeals arguing that the trial judge erred by denying his motions.

## THE AFFIDAVIT ESTABLISHED PROBABLE CAUSE TO SEARCH

Before the trial judge, and again before this Court, Sisson made three arguments for why the affidavit failed to establish probable cause. First, he argued that the affidavit only indicated when AOL "discovered" the email rather than when the email was "transmitted." Thus, it was impossible to determine when the crime was actually committed and, therefore, impossible to conduct a staleness analysis. Consequently, the information in the affidavit was *ipso facto* stale. Second, Sisson argued that the police recklessly omitted information on email "spoofing" and that this information, if it had been included, would have vitiated the probable cause determination.[9] Finally, Sisson argued that his AOL username insufficiently linked him and his residence to the digital

---

2. *Id.* at 873.

3. 11 *Del. C.* § 1108

4. 11 *Del. C.* § 1109

5. 11 *Del. C.* § 1111.

6. *Sisson I*, 883 A.2d 868.

7. *State v. Sisson*, 883 A.2d 68 (Del.Super.2005) ("*Sisson II*")

8. Sisson later entered into a plea agreement with respect to the severed child pornography counts, and pleaded guilty to and was sentenced on two counts of Dealing in Child Pornography.

9. Before the trial judge, Sisson also argued that the detectives knowingly included false information in the affidavit. The trial judge found otherwise and Sisson did not appeal this ruling.

picture discovered. The trial judge rejected these contentions, as do we. Our reasons follow.

### Probable Cause Generally

Under the Delaware and the United States Constitutions, "a search warrant may be issued only upon a showing of probable cause."[10] An affidavit in support of a search warrant must, within the four-corners of the affidavit, set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place.[11] In determining whether probable cause to obtain a search warrant exists, we apply a totality of the circumstances test.[12] Thus, a magistrate may find probable cause when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[13] Moreover, a neutral and detached magistrate may draw reasonable inferences from the factual allegations in the affidavit.[14]

We review a magistrate's probable cause determination with great deference, considering it as a whole in a practical, commonsense manner, and not on the basis of a hypertechnical analysis of its separate allegations.[15] We do so because "[a] grudging or negative attitude by reviewing courts toward warrants is inconsistent with the *Fourth Amendment's* strong preference for searches conducted pursuant to a warrant...."[16] Therefore, our duty is simply to ensure that the magistrate had a substantial basis for concluding that probable caused existed.[17] Giving great deference to the magistrate's decision, however "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions."[18] Where the facts are not disputed and only a constitutional claim of probable cause is at issue, we will review the Superior Court's application of the law of probable cause *de novo*.[19]

10. *Fink v. State*, 817 A.2d 781, 786 (Del. 2003); U.S. Const. Amend. IV, Del. Const. art. 1, § 6.

11. *Fink*, 817 A.2d at 787 (citing 11 *Del. C.* § 2306; *Dorsey v. State*, 761 A.2d 807, 811 (Del.2000)); *Blount v. State*, 511 A.2d 1030, 1033 (Del.1986); *Pierson v. State*, 338 A.2d 571, 573 (Del.1975).

12. *Fink*, 817 A.2d at 787; *See also Gardner v. State*, 567 A.2d 404 (Del.1989).

13. *Stones v. State*, 676 A.2d 907, 1996 Del. LEXIS 123, *5 (Del.1996) (Order) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). *See also United States v. Mortimer*, 2005 WL 318650, 2005 U.S.App. LEXIS 2208, *4 (3d Cir.2005).

14. *James v. State*, 505 A.2d 453, 1985 Del. LEXIS 583, *6 (Del.1985) (Order) *See also United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir.2006) ("The issuing judge is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts.").

15. *Smith v. State*, 887 A.2d 470, 473 (Del. 2005) (quoting *Blount*, 511 A.2d at 1034).

16. *Smith* 887 A.2d at 473 (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

17. *Scott v. State*, 615 A.2d 532, 1992 Del. LEXIS 494, *8 (Del.1992) (Order) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *See also Mortimer*, 2005 WL 318650, 2005 U.S.App. LEXIS 2208, at *3.

18. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d. Cir.2002) (quoting *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d. Cir.1983)).

19. *Smith*, 887 A.2d at 473. *See e.g., Theis v. State*, 2005 WL 3076935, 2005 Tex.App. LEXIS 9683, *7–8 (Tex.App.2005) ("We review *de novo* the trial court's application of the law of search and seizure and probable cause. [citation] Appellate review of the sufficiency of an affidavit in support of a search warrant, however, is not *de novo*; rather, great deference is

With respect to staleness, it is clear that "[p]robable cause must be based on current information, not conjecture, for stale information will not support a finding of probable cause." [20] In other words, "probable cause must exist to believe that the specified items are *presently* on the premises...." [21] While statements of dates and times are instructive, they are not dispositive to ascertaining the existence of probable cause.[22] Instead, magistrates and courts must consider other factors including the kind of property for which authority to search is sought, and whether the evidence sought is highly incriminating or consumable and thus less or more likely to remain in one location.[23] The validity of probable cause cannot be quantified "by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit." [24] Rather, in determining whether information has become stale due to an impermissible delay in securing a warrant, courts must examine all the relevant facts and circumstances in a "practical and flexible manner." [25]

## A. The information in the affidavit was not stale

Sisson focuses on one word in one sentence in the affidavit of probable cause to support his staleness argument: "The email was *discovered,* by AOL, on January 2, 2004." According to Sisson, because the affidavit indicated only when AOL "discovered" the email, not "when it was transmitted and the alleged offense occurred ..., [w]hen the offense ... occurred is ... conjectural." Therefore, Sisson contends, there is no starting point to begin a staleness analysis; it is simply not possible to determine the duration of time between the alleged offense and the DSP's effort to find incriminating evidence. Consequently, Sisson concludes, the affidavit is insufficient to establish probable cause. We disagree.

Sisson's narrow focus on the word "discovered" and the argument that flows from it is misplaced because it involves a hypertechnical analysis of the affidavit's separate allegations, rather than a commonsense approach to the affidavit in its entirety. Viewing the affidavit as a whole and considering the totality of the circumstances, the issuing magistrate was free to draw upon his commonsense to infer reasonably from the facts alleged that there was a fair probability that AOL discovered the email within a short time—perhaps one or two days—after "letsrolearound"

given to the magistrate's determination of probable cause.")

20. *Pierson,* 338 A.2d at 573

21. *Id.* (emphasis in original). *See also United States v. Grubbs,* —— U.S. ——, ——, 126 S.Ct. 1494, 1499 n. 2, 164 L.Ed.2d 195 (2006) (parenthetical) (quoting *United States v. Wagner,* 989 F.2d 69, 75 (2nd Cir.1993)) ("[T]he facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."); *United States v. Hython,* 443 F.3d 480 (6th Cir.2006).

22. *Jensen v. State,* 482 A.2d 105, 111 (Del. 1984) (citations omitted).

23. *Id.* at 112. *See United States v. Abboud,* 438 F.3d 554, 572–73 (6th Cir.2006).

24. *Jensen,* 482 A.2d at 112 (quoting *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972)).

25. *Smith,* 887 A.2d at 475 (quoting *Jensen,* 482 A.2d at 112). *See also United States v. Washington,* 139 Fed.Appx. 479, 482 (4th Cir. 2005).

transmitted the email. While this may not have been the only inference the magistrate could have drawn from the "discovered" language in the affidavit, it certainly was not unreasonable.[26]

The nature of the evidence in this case adds further support to the magistrate's determination that probable cause existed. Sisson does not dispute that:

> child pornography is difficult to obtain; that it is more likely to be retained and secreted by its possessor for longer periods of time than other types of contraband such as weapons or controlled substances; and that special computer programs used by police may recover it long after it was acquired and any attempts to delete it from the computer.[27]

The fact that child pornography is not highly consumable and that those who collect child pornography tend to keep it for long periods of time adds support to the magistrate's analysis in this case.[28] Based on their training and expertise, the detectives stated in the affidavit of probable cause: "The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. . . ."

Even if, for example, the magistrate had inferred that "letsrolearound" transmitted the email two months before AOL discovered it (which may have been less reasonable than inferring a transmission closer to the date of discovery), he still could have found probable cause to search, because he was aware that those who collect child pornography tend to retain it for long periods of time. Considering the nature of child pornography, the magistrate could have reasonably inferred that "letsrolearound" transmitted the email around January 2, 2004. Giving the requisite "great deference" to the magistrate's finding, it is clear that the issuing magistrate had a substantial basis for finding probable cause that images of child pornography were *presently* on Sisson's computer. With the reasonable inference in place, the magistrate could have concluded that less than three months had passed from the time "letsrolearound" sent the email and the time that the DSP executed the search warrant on March 24, 2004. Because of the nature of child pornography, the less-than-three-month time period did not render the information in the warrant stale.

Finally, Sisson's reliance on *Pierson v. State*[29] is misplaced. In *Pierson* it was "undisputed and manifest on the face of

---

**26.** *See e.g., United States v. Gourde,* 440 F.3d 1065, 1071 (9th Cir.2006) (en banc) (split panel) (Search warrant was supported by probable cause where "the only inference the magistrate judge needed to make was that there was a 'fair probability' [defendant] had, in fact, received or downloaded images."); *State v. Wright,* 890 A.2d 703, 704 (Me.2006). In *Wright,* the affidavit in support of the search warrant revealed that the defendant's friend viewed child pornography on the defendant's computer almost three months before the date of the affidavit. The defendant argued that there was no basis in the affidavit for the "three months" determination because the affidavit stated that the witness "viewed the images in late January or early February" but did not state the year. *Id. at* 704. The Court disagreed, noting that "[a]lthough the

affidavit does not state the year, *the court's determination was based on a reasonable inference." Id.* at 704, n. 1 (emphasis added).

**27.** Defendant's Reply Br., pg. 1; *See Smith,* 887 A.2d at 474 (citing cases).

**28.** *See U.S. v. Zimmerman,* 277 F.3d 426, 434 (3d Cir.2002) (discussing *United States v. Harvey,* 2 F.3d 1318 (3d Cir.1993) (". . . pedophiles rarely, if ever, dispose of child pornography. . . . Presumably individuals will protect and retain child pornography for long periods of time because it is illegal and difficult to obtain.")).

**29.** 338 A.2d 571.

the warrant application/affidavit that it contain[ed] no statement as to times or dates, except the date of notarization."[30] Because the warrant application contained *no times or dates whatsoever* we held that the affidavit failed to establish probable cause.[31] *Pierson* is clearly distinguishable, because here the magistrate could reasonably infer from the facts on the face of the affidavit that there was a fair probability that AOL discovered the email around the time it was sent on January 2, 2004. For these reasons, Sisson's staleness argument must fail.

### B. The detectives did not recklessly or intentionally omit material information from the affidavit

Sisson next argues that the detectives recklessly omitted information on email spoofing in the affidavit of probable cause and that the magistrate would have been unable to make the probable cause determination had the information been included. As the trial judge noted, "E-mail spoofing occurs when a computer user receives email that appears to originate from one source when it was actually sent from another source."[32] According to Sisson, the affidavit of probable cause should have disclosed how spoofing could have caused the email in question to "appear ... to [have] be[en] sent by the AOL user name 'letsrolearound' subscribed to by the defendant and his wife, [even though] it also could have been transmitted from a different computer location not associated with the defendant's username." Moreover, Sisson argues, the affidavit of probable cause also should have disclosed that AOL had purged the original email at issue pursuant to its email retention policy long before the DSP investigation, and that, therefore, it was impossible to review the electronic header of that original email in order to accurately determine that spoofing did not account for the email appearing to have been sent by the username

30. *Id.* at 572.

31. *Id.* at 574.

32. *Sisson,* 883 A.2d at 874 n. 19 (citing Carnegie Mellon Software Engineering Institute, CERT Coordination Center, *Spoofed/Forged E-mail,* at http://www.cert.org/tech_tips/_email_spoofing.html). Interestingly, in briefing before this Court, Sisson seems to suggest that a potential spoofer would need the username *and* the password associated with that username in order to spoof. As noted in his opening brief: "anyone familiar with the user name 'letsrolearound' *and the user's password* could have logged onto the AOL server from any computer on the internet and sent an email which appeared to originate from the username 'letsrolearound.' " (pg 8, emphasis added). As we understand it, the situation Sisson describes would not be spoofing at all because the email would in fact be sent from the legitimate "letsrolearound@aol.com" email account, even though it could have been sent from a nearby library or coffee shop by one of Sisson's family members, friends, or anyone else with access to Sisson's password. Sisson's reference to the password seems to undercut his spoofing argument. If a password is required, there are fewer people who will be able to spoof any particular account. In any event, the expert testimony at the evidentiary hearing suggests to us that a spoofer can spoof without having access to the password associated with the spoofed AOL account. The expert testified that:

> Email spoofing is an activity that goes on, whereas, I can send an email to anyone in this room, assuming I know your email address, and I can make it look like it came from anybody I want to make it look like it came from. I can send you an email, and when you read that email, I can make it so that it appeared as though it was from georgewbush@whitehouse.gov ... [even though I had no special access to the georgewbush@whitehouse.gov email account].

For purposes of this opinion, we will assume that it is this latter type of "password-not-required-spoofing" that Sisson is attempting to describe.

"letsrolearound." [33]

 "If the police omit facts that are material to a finding of probable cause with reckless disregard for the truth, then the rationale of *Franks v. Delaware* applies." [34] In *Franks v. Delaware*[35] the United States Supreme Court held:

Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if

probable cause was lacking on the face of the affidavit.[36]

Thus, in the so-called reverse-*Franks* situation, if the defendant establishes by a preponderance of the evidence that the police knowingly and intentionally, or with reckless disregard for the truth, omitted information material to a finding of probable cause, the reviewing court will add the omitted information to the affidavit and examine the affidavit with the newly added information to determine whether the affidavit still gives rise to probable cause.[37]

After hearing testimony from the two DSP detectives who prepared the affidavit of probable cause and from the defendant's expert, the trial judge orally ruled that there was no evidence to suggest that there was "either an intentional or reckless withholding of ... information." [38] Alternatively, the trial judge concluded that "none of the items identified by the defendant would have made a difference in the probable cause analysis." In a following written opinion, the trial judge confirmed that Sisson "failed to carry his burden of

**33.** Before the trial judge, Sisson also argued that the affidavit of probable cause also should have disclosed (1) that there were no past NCMEC CyberTipline reports involving the letsrolearound username; (2) that the NCMEC CyberTipline searched the internet to find other connections between letsrolearound and child pornography but found nothing; (3) that, at the request of the DSP, the FBI conducted an online search, that also returned negative results; and (4) that the affidavit should have included information on identity theft and "spamming." Sisson also argued that portions actually included in the affidavit were recklessly misleading because they implied that the DSP actually had the email in their possession. As the trial judge found, looking at the totality of the circumstances in a practical, commonsense manner, these arguments have no merit. In any event, Sisson did not raise them on appeal.

**34.** *Smith,* 887 A.2d at 472; *United States v. Abboud,* 438 F.3d 554, 574 (6th Cir.

2006)("This Court has interpreted *Franks* to include omissions.")

**35.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**36.** *Blount,* 511 A.2d at 1033 (quoting *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674)

**37.** *Smith,* 887 A.2d at 472; *See Wilson v. Russo,* 212 F.3d 781, 789 (3d Cir.2000) ("To determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.")

**38.** The trial judge also concluded that there was no "information in the affidavit that would be grounds for a *Franks* challenge ... [because he] found no information that was either intentionally ... or recklessly misleading...."

proving that the detectives omitted information regarding 'spoofing' with reckless disregard for the truth." [39]

Sisson suggests that the trial judge erred by finding that the detectives did not omit the information with a reckless disregard for the truth. He cites *Wilson v. Russo*,[40] *Rivera v. United States*[41] and *United States v. Perez*[42] for the proposition that the required reckless disregard under *Franks* may be inferred where clearly critical information to the probable cause determination has been omitted from the search warrant application regardless of the affiant's subjective state of mind. Although the trial judge found that Sisson failed to carry his burden of proving that the detectives intentionally or recklessly withheld information, Sisson argues that we should infer that the detectives were reckless based on the standard articulated in these cases.

In *Wilson*, the Third Circuit considered what the *Franks* phrase "reckless disregard for the truth" means. The Court first noted that "unfortunately, the [United States] Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake is insufficient.' " [43] Left with little guidance from the United States Supreme Court, the Third Circuit concluded that reckless disregard for the truth means different things when dealing with omissions and assertions. For purposes of this opinion, we need only consider the standard that applies to omissions. According to the Third Circuit in *Wilson*, "omissions are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.' " [44] In *Rivera*, the Second Circuit also attempted to provide some guidance on what constitutes reckless disregard: "recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." [45]

The Court in *Perez* applied these standards to the facts of an affidavit of probable cause to search for child pornography.[46] In *Perez*, the defendant subscribed

**39.** *Sisson I*, 883 A.2d at 874 (citing *Blount*, 511 A.2d 1030).

**40.** 212 F.3d 781 (3d Cir.2000). *Wilson* was a civil rights lawsuit arising under 42 U.S.C. § 1983, in which the Court considered the plaintiff's argument that his arrest violated his state and federal constitutional rights. The plaintiff argued that the arresting officer, one of the named defendants, lied and omitted material facts during his application for the plaintiff's arrest warrant. *Id.* at 783.

**41.** 928 F.2d 592 (2d Cir.1991).

**42.** 247 F.Supp.2d 459 (S.D.N.Y.2003).

**43.** *Wilson*, 212 F.3d at 787 (quoting *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir. 1979) (quoting *Franks*, 438 U.S. at 171, 98 S.Ct. 2674))

**44.** *Id.* at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.1993)).

**45.** 928 F.2d at 604. (citations omitted).

**46.** *Perez* was one of the many child pornography cases involving the FBI's "Operation Candyman." *See also United States v. Strauser*, 247 F.Supp.2d 1135 (E.D.Mo.2003); *United States v. Bailey*, 272 F.Supp.2d 822 (D.Neb.2003) (magistrate judge's recommendation, later adopted by district court judge) (D.Neb.2003); *United States v. Martin*, 426 F.3d 68 (2d Cir.2005)(collecting cases) *rehearing denied by* 426 F.3d 83, *rehearing, en banc, denied by* 430 F.3d 73 *cert denied by* 126 S.Ct. 2861 (2006) (NO. 05–1073); *United States v. Coreas*, 419 F.3d 151 (2d Cir.2005) *rehearing denied by* 426 F.3d 615, *rehearing, en banc, denied by* 430 F.3d 73, *cert denied by* 126 S.Ct. 2861 (2006) (NO. 05–1062)

to an egroup[47] by entering his email address through the website associated with the group,[48] but paid no fee.[49] At some point an undercover FBI agent subscribed.[50] During the time the FBI agent was a member he received numerous emails with pictures of child pornography attached.[51] The FBI agent prepared an affidavit of probable cause describing the egroup, stating that all new members were automatically added to the egroup's mailing list and that every member on the email list automatically received every email message transmitted by every other member to the group.[52] Thus, the affidavit stated, when individual members transmitted child pornography the images automatically went to every member of the group.[53] These statements were inaccurate because the egroup members, in fact, had three email delivery options: (1) receipt of all emails; (2) receipt of a daily digest of emails; and (3) receipt of no emails.[54]

After extensively reviewing the facts, the district court judge noted the reckless disregard standard of *Wilson* and *Rivera* and then applied the standard to the facts.[55] He concluded that the FBI agent acted with reckless disregard for the truth by erroneously affirmatively representing that all members of the egroup received every email and therefore every member received images of child pornography transmitted to the group.[56] The judge also concluded that the FBI recklessly omitted the fact that the egroup members had three email delivery options, including the option not to receive emails.[57] Having concluded that the FBI recklessly disregarded the truth, he deleted the affirmative misstatements and added the omitted information to form a "corrected" affidavit.[58] Reviewing the "corrected" affidavit, the judge determined that there was no representation that the defendant "received any emails or that he received or downloaded or viewed any images or files or that he sent or uploaded any images or files."[59] All that was left was the fact that the defendant subscribed to a website where unlawful images of child pornography could be downloaded.[60] This was not enough to permit a magistrate judge to determine that probable cause existed that child pornography would be found in the defendant's home.[61]

We are satisfied that *Perez* is distinguishable on its facts. Unlike *Perez*, where there was nothing in the affidavit to connect the defendant to any downloaded images of child pornography, here the image of child pornography was directly associated with a "sent email by letsrolea-

---

47. "An egroup is an internet forum through which persons with similar interests can interact by email and online 'chat,' and by posting messages, pictures, and videos to the group's website." *Martin*, 426 F.3d at 70 n. 1.

48. *Perez*, 247 F.Supp.2d at 471.

49. *Id.* at 462–64.

50. *Id.* at 465–66.

51. *Id.* at 462.

52. *Id.*

53. *Id.*

54. *Id.* at 463.

55. *Id.* at 474.

56. *Id.* at 479–80.

57. *Id.*

58. *Id. at* 480.

59. *Id. at* 481.

60. *Id.*

61. *Id.*

round." Because *Perez* is distinguishable, we are left with the standards for reckless disregard articulated by the Third and Second Circuits. Even applying the "clearly critical" *or* the "reasonable-person-would-have-known-a-magistrate-would-have-wished-to-know" standards for reckless disregard to the record, we cannot conclude that the trial judge erred in this case.

The trial judge apparently concluded that Sisson made a "substantial preliminary showing" that the detectives omitted the "spoofing information" from the affidavit with reckless disregard for the truth by attaching a computer print-out of a portion of the *www.cert.org* website on "spoofed/forged" email. He then held an evidentiary hearing at which both DSP detectives and the defendant's computer expert testified. We have carefully examined the record of the evidentiary hearing and conclude that the trial judge did not abuse his discretion by finding that the DSP detectives did not omit information in reckless disregard of the truth.[62] Nor is there sufficient evidence in the record for us to independently infer that the DSP detectives acted with reckless disregard for the truth. Although Sisson may have presented some evidence tending to establish that the detectives acted with reckless disregard, that evidence, in our judgment, failed to meet the preponderance standard. The detectives may have been negligent, but negligence without more is not sufficient to require that that we add the omitted material and examine the "corrected" affidavit.[63]

■ In any event, assuming for the sake of argument that the detectives omitted the information in reckless disregard of the truth, we agree with the trial judge's alternate holding that the omissions were simply not material. Had the omitted items been included, the magistrate still could have determined that there was a fair probability that a search of Sisson's home would reveal contraband. The omitted items may have made it less likely that probable cause existed, but would not have entirely vitiated the magistrate's determination had they been included.

## C. The AOL username was sufficient to establish a nexus between the defendant's residence and computer and the intercepted image of child pornography

■ In his third argument on appeal, Sisson suggests that the AOL username, "letsrolearound," standing alone, provides an insufficient nexus between the image AOL discovered and the defendant's residence and computer to support the magistrate's probable cause determination. According to Sisson, to establish the required nexus between the defendant's residence and computer and the image of child pornography, the affidavit should have informed the magistrate of the internet protocol ("IP") address of the email sent from the letsrolearound@aol.com email address. Only with this IP address, Sisson suggests, could the magistrate "reliably determine ..." the sender's identity because, it appears from the expert testimony below, while an email address can be "spoofed," an IP address cannot. Instead, an IP address obtained from the "header" information of an email message specifically links that email to a particular computer.

At oral argument, Sisson's counsel contended that this issue and the *Franks* issue were "mirror images," apparently be-

---

62. *See Smith,* 887 A.2d at 473.

63. *See United States v. Rivera,* 410 F.3d 998, 1002 (8th Cir.2005) (citations omitted).

cause the affidavit failed to include IP address information. It does not appear that Sisson is arguing that the DSP detectives acted with reckless disregard for the truth by failing to include the IP address (which they apparently did not have in their possession because they lacked the email that AOL had purged). Rather, Sisson's argument appears to be that the IP address was required to establish the link between the email sent from "letsrolearound" because the specter of "spoofing" made it possible that Sisson did not send the email. Thus, Sisson concludes, only the IP address plus the username (or perhaps the IP address standing alone) would be sufficient to provide probable cause to search his home and computer.

The parties cited a litany of cases to the trial judge [64] and a slightly different litany of cases to us. The trial judge relied upon *State v. Evers,*[65] which he determined was "most factually and legally on point," to conclude that "an internet screen name alone can be sufficient to link the Internet subscriber associated with that screen name to criminal activity for purposes of establishing probable cause."[66]

In *Evers,* a detective from the San Bernardino (California) County Sheriff's Office entered an AOL chat room devoted to sexual activity involving children.[67] He submitted his screen name and email address to a list-serve associated with the chat room that allowed other AOL subscribers interested in the subject matter to communicate with each other. Shortly thereafter, the detective checked his email and discovered responses from ninety-eight different screen names from the chat room. A response from the user with a screen name of "BTE324" contained images of child pornography.[68] With this information, the detective obtained a warrant, which he served on AOL, seeking the identities of the ninety-eight users. AOL provided him with the name of the account holder and the billing address for "BTE324," one of the ninety-eight.[69]

BTE324 was registered to a New Jersey address, belonging to the defendant's wife.[70] The California detective, therefore, forwarded the information to New Jersey authorities. Based on the California detective's investigation, a New Jersey detective applied for a warrant to search the defendant's residence and computers. A magistrate reviewed the affidavit and found probable cause to issue the warrant. The police executed the warrant and seized the hard drive of the defendant's computer, which contained images of child pornography.[71]

The defendant argued, among other things, that the AOL billing address for the BTE324 screen name did not resolve whether BTE324 "actually used the computer for illicit purposes at the same location, and therefore, that there was not a well-grounded suspicion that search of [the defendant's] home would yield evidence of child pornography."[72] The New Jersey Supreme Court disagreed, and upheld the magistrate's finding of probable cause. The Court first noted that there was a fair

**64.** *See Sisson I,* 883 A.2d at 877, n. 38.

**65.** 175 N.J. 355, 815 A.2d 432 (2003).

**66.** *Sisson I,* 883 A.2d at 878.

**67.** *Evers,* 815 A.2d at 437.

**68.** *Id.*

**69.** *Id.* at 438.

**70.** *Id.*

**71.** *Id.*

**72.** *Id.* at 446.

probability that the computer would be at the defendant's residence:

> The billing address of an account tied to a computer screen name may not be an absolute guarantee that the holder of the computer screen name used the computer at the billing address to commit criminal activity, but there is a fair and logical inference that the computer will *probably* be found at that address and, if not, at least evidence of the identity of the holder of the screen name will be found there.[73]

Second, the court "conclude[d] that there was probable cause to believe that pornographic images of children would be retained on the computer of the person using the screen name 'BTE324.' " [74] In so doing, the Court relied upon the affidavit's statement that child pornographers rarely destroy "the photographs and images of their prurient interest" and the "solid precedent" supporting the detective's investigative reasoning.[75] For these reasons, the Court held that the probable cause standard for the issuance of a search warrant was satisfied.[76]

Before the trial judge, Sisson attempted to distinguish *Evers*. The trial judge properly concluded that *Evers* was not distinguishable on the ground Sisson proffered.[77] Before this Court, Sisson appears to concede that *Evers* is factually analogous,[78] but suggests that we should look to the analysis in *Evers* and not to the result.[79] In his reply brief, Sisson quotes a passage of *Evers* at length. For the sake of completeness, we quote *Evers* at greater length:

> There is nothing in the present record to indicate whether or not it was possible to determine the precise point of transmission of the email sent to [the California detective]. At oral argument, the State admitted that it did not know whether such information was obtainable. We note with approval that in several other cases, law enforcement officials took additional steps to verify that the computers from which offending im-

---

**73.** *Id.* at 448 (emphasis in original) (citing *United States v. Campos*, 221 F.3d 1143, 1145 (10th Cir.2000), *Hause v. Commonwealth*, 83 S.W.3d 1, 4–5, 11–12 (Ky.Ct.App.2001)) (parentheticals omitted).

**74.** *Id.* at 448.

**75.** *Id.* 447–448 quoting *United States v. Lamb*, 945 F.Supp. 441, 460 (N.D.N.Y.1996) ("Since the materials are illegal to distribute and possess, initial collection is difficult. Having succeeding in obtaining images, collectors are unlikely to quickly destroy them.") (additional citation omitted).

**76.** *Id.* at 450

**77.** *Sisson I*, 883 A.2d at 878.

**78.** Defendant's Reply Br., pg 6 (*"While Evers permitted the issuance of a search warrant where the nexus to the suspected offender was established through the username of the person believed to have transmitted the email, it did* not address and did not rule on whether the computer internet protocol ... address of the suspected offender should also be identified in order to establish a reliable identification.") (emphasis added).

**79.** The trial judge considered whether the fact that in *Evers* a law enforcement officer obtained the images and, here AOL obtained the image, impacted the probable cause analysis. Sisson argued that neither AOL nor NCMEC were "reliable sources and that any finding of probable cause based on information from these sources is flawed as a matter of law." *Sisson*, 883 A.2d at 879. The trial judge concluded that "AOL was a reliable informant and no independent corroboration of the information provided by AOL was required." *Id* at 880. Sisson did not advance any argument on appeal concerning AOL or NCMEC's reliability as an informant. Thus, we need not consider the issue. *See Murphy v. State*, 632 A.2d 1150, 1152 (Del.1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal.")

ages were sent were located in the defendants' residences. [citations] *Although there is nothing in the record to suggest that such additional information was available in this case, law enforcement officers should, when possible, turn to available sources of information which may give greater accuracy to the probable cause determination.* The Fourth Amendment . . . does not render ignorance bliss.

We do not suggest that if it were possible to obtain the precise point of transmission in this case, the failure to do so would have invalidated the warrant. However, technological advances, if they do not already, may soon permit law enforcement officers to determine easily through Internet service providers the exact point of transmission of personal computer email. A single billing account for an Internet service provider, such as AOL, may cover the charges for a number of computers used by different members of a family. Given the mobility of our society, even that of the nuclear family, some computers may be at home and others in more distant locations. For example, parents may pay the account for computers used by their children in college. A laptop computer can be used at any number of locations other than the billing address. For this reason, a judge reviewing an application for the search of a home should make certain that reliable information, which is accessible in a timely manner, is utilized in making the probable cause determination of the locale of a computer used for criminal purposes. In other words, our courts must consider the new realities of our ever-expanding technological world. Nonetheless, the proofs in support of a search warrant will continue to be examined in a common-sense and not a hypertechnical manner.[80]

Sisson seizes on this language, particularly the italicized language, to argue for a reversal. In *Evers*, the record was incomplete because nothing indicated whether it was possible to determine the precise point of transmission of the email BTE324 sent. Here, in contrast, Sisson contends that the expert testimony at the evidentiary hearing established that the IP address information, "would have been available [to determine the precise point of the email sent] but its absence was not disclosed in this case." Sisson argues that if the New Jersey Supreme Court had evidence before it like the expert testimony in this case, the outcome would have been different. We disagree because the very language the Court itself used belies this contention: "We do not suggest that if it were possible to obtain the precise point of transmission in this case, the failure to do so would have invalidated the warrant."[81] Had the New Jersey Supreme Court been as concerned with the possibility of determining the precise point of BTE324's email transmission as Sisson suggests, that Court assuredly had the inherent power to remand the case to a trial judge with instructions to supplement the record by examining the methods of the "ever-expanding technological world" and whether these methods permitted the investigating officers to determine the point of transmission. In short, we do not read the dictum from *Evers* as Sisson does. The quoted language from *Evers* was not necessary or central to its holding, and we decline to adopt what Sisson calls the "analysis" of *Evers* as opposed to examining its "result."

Sisson also cites several other cases to support his argument that the username

---

**80.** *Evers*, 815 A.2d at 449–50. (emphasis added).

**81.** *Id.* at 449.

was insufficient to establish the required nexus between the image and his residence and computer. Of these cases, we will discuss only *Taylor v. State*[82] in any detail.[83] *Taylor* appears to have arisen out of the same investigation as *Evers*. The same California detective entered an AOL chatroom, around the same time as in *Evers*, and "someone using the screen name 'MENU441@aol.com' purportedly 'contacted detectives from the San Bernardino County Sheriff's Department and transmitted child pornography and/or child erotica images via the internet …' "[84] After receiving subscriber information from AOL, the California detective forwarded the information to a Texas Ranger, and, consequently, the Texas Ranger applied for and was issued a warrant to search the defendant's home. The search revealed evidence of possession of child pornography.[85] After listing 17 items not included in the affidavit, the Court concluded that the affidavit included three relevant pieces of information: (1) that there was one instance of one image being sent within a three month time frame from somewhere over the internet to someone in the California Sheriff's Office by someone using the username MENU441; (2) a general description of the propensities of someone "involved" in trading and collecting child pornography; and (3) the representation

that the screen name MENU441 "*comes back to* [the defendant's address]."[86] The Court noted:

> Admittedly, a search of AOL records indicated that "MENU441" somehow "comes back to" [the defendant] who lived at a specified address. Yet, that [the defendant] utilized or had assigned to him the screen name *when the transmission was sent*, that he owned or otherwise maintained a computer or computer related equipment at the locale, that he had the capability of accessing AOL from the address, that the transmissions came from a particular computer or internet related equipment at [the defendant's address], or that others could not use the screen name appeared nowhere in [the Texas Ranger's] affidavit or its attachments. Furthermore, we do not think it reasonable to infer the presence of those indicia simply because a search of AOL records 1) attributed the screen name to [the defendant] at one time or another and 2) contained the address eventually searched.[87]

The Court then held that the facts in the affidavit were insufficient to support the magistrate's finding that a fair probability of finding child pornography at the defen-

---

82. 54 S.W.3d 21 (Tex.App.2001).

83. Sisson also cites *United States v. Gourde*, 382 F.3d 1003 (9th Cir.2004) *different result reached after rehearing en banc* 440 F.3d 1065 (March 9, 2006); *United States v. Greathouse*, 297 F.Supp.2d 1264 (D.Or.2003); *United States v. Perez*, 247 F.Supp.2d 459 (S.D.N.Y. 2003). We are satisfied that *Greathouse* and *Perez* are not sufficiently analogous to control the outcome. Moreover, neither addressed the precise issue involved in this case. *See Supra pgs.* 19–21 for a discussion of *Perez*. Furthermore, while this appeal was pending, the Ninth Circuit issued an *en banc* opinion in *Gourde* that reached a different result than

the panel decision upon which Sisson relies. To the extent that *Gourde* initially supported Sisson's position, it now appears to support the State's position.

84. *Taylor*, 54 S.W.3d at 22. Interestingly, the *Evers* Court did not mention or cite *Taylor* at all despite the fact that *Taylor* was decided (February 27, 2001) before *Evers* was submitted for decision (September 24, 2002).

85. *Id.* at 22–24.

86. *Id.* at 25. (emphasis added).

87. *Id.* at 26. (emphasis in original)

dant's home existed.[88]

It is possible to distinguish *Taylor* on its facts. Here, unlike *Taylor*, the affidavit included information that Sisson was the "principle [sic]" of Netvantage Solutions Inc., a company that offered "intranet development, computer support, and software integration and Internet services"— all computer-related services. Moreover, the police checked the address listed for Netvantage Solutions and determined that it was a Mailboxes, Etc. drop box. In other words, Netvantage Solutions did not appear to have an actual physical location. This information lends support to the reasonable inference of a fair probability that Sisson—the principal of a business that provides computer services but might not have had a physical location—was likely to have computer equipment in his residence.[89] Even if *Taylor* is not sufficiently factually distinguishable on this ground, we find *Evers* more persuasive.[90] Accordingly, we hold, on the facts of this case, that: (i) the "letsrolearound" username, together with (ii) the Florida AOL billing address linking Sisson to that username, (iii) the fact that the DSP traced Sisson to his Hockessin address through driving records, and (iv) the fact that Sisson was the principal in a computer business with a drop box as the listed address, provided the magistrate with a substantial basis for concluding that a fair probability existed that there was a computer in Sisson's residence upon which images of child pornography might be found.

## THE 10 COUNTS IN THE INDICTMENT FOR SEXUAL EXPLOITATION OF A CHILD DID NOT VIOLATE DOUBLE JEOPARDY, EQUAL PROTECTION, OR DUE PROCESS

Sisson was indicted on ten counts of Sexual Exploitation of a Child under 11 Del C. § 1108. He moved to dismiss nine of the ten counts as multiplicitous. In a well-reasoned opinion, the trial judge denied Sisson's motion, concluding that under § 1108 and 11 Del. C. § 1103 "each separate photograph, motion picture or digitally created image is a single 'visual depiction'" and that "the creation of each 'visual depiction' . . . is a separate criminal offense." [91] The case proceeded to a bench trial at which the trial judge found Sisson guilty of six of the ten counts. The trial judge then sentenced Sisson to the minimum mandatory of 12 years in prison.[92]

---

88. *Id.* at 27.

89. *See Id.* at 25.

90. *See also United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir.2002) (The investigating officer "established a sufficient nexus between the defendant and the internet moniker by providing evidence that the name was registered to him."); *State v. Hinkel*, 2000 WL 1847569, 2000 Ohio App. LEXIS 5961 (Ohio Ct.App.2000) (split panel). At the evidentiary hearing in this case, the trial judge considered whether the return address on piece of "snail" or regular mail containing contraband was analogous to the username on an email with an attached image of child pornography. At oral arguments, we also considered that analogy. *Hinkel* seems to support the proposition that a return address might be sufficient, in some cases, to support a finding of probable cause to search the return address listed for contraband. We express no opinion on this issue or on whether *Hinkel* was correctly decided. *Hinkel* appears to lower the threshold required for a return address to give sufficient probable cause to a situation where the police have direct evidence that someone other than, and apparently completely unrelated to, the person residing at the return address sent "snail" mail spoofing that address.

91. *Sisson II*, 883 A.2d at 71.

92. Sisson also received three years at Level 5 suspended for 1 year at level 2 for the two counts of Unlawfully Dealing in Child Pornography to which he pleaded guilty.

Sisson now appeals, claiming that the trial judge erred in his interpretation of § 1108, and, that if this interpretation is correct, the statute violates the due process and equal protection clauses of the United States Constitutions. Sisson raises three constitutional claims that we will review *de novo*.[93]

### A. Multiplicity and Double Jeopardy

 On appeal, Sisson again argues that under the "multiplicity doctrine" the trial judge should have dismissed nine of the ten counts of Sexual Exploitation of a Child. The "multiplicity doctrine" is a subset of the protections afforded under the Double Jeopardy Clause.[94] The Double Jeopardy Clause, as a constitutional principle, protects a defendant (1) against successive prosecutions; (2) against multiple charges under separate statutes; and (3) against being charged multiple times under the same statute.[95] Multiplicity is the "charging of a single offense in more than one count of an indictment."[96] Dividing "a single offense into multiple counts of an indictment violates the double jeopardy provisions" of both the Delaware and the United States Constitutions.[97] Therefore, "prosecutors may not manufacture additional counts of a particular crime by the simple expedient of dividing a single crime into a series of temporal or spatial units."[98] When determining whether the constitutional protection against double jeopardy permits multiple counts in any particular statutory setting, we look to legislative intent.[99] In this case, therefore, we must determine the appropriate "unit of prosecution" under § 1108.[100] We thus turn to the text of the relevant statutes.

 11 Del C. § 1108(1) provides:

A person is guilty of sexual exploitation of a child when:

(1) The person knowingly, photographs or films a child engaging in a prohibited sexual act or in the simulation of such an act, or otherwise knowingly creates a visual depiction of a child engaging in a prohibited sexual act or in the simulation of such an act; . . .

"Visual depiction" is a defined term that means:

(1) Any image which is recorded, stored or contained on or by developed or undeveloped photographic film, motion picture film or videotape; or

(2) Data which is stored or transmitted on or by any computer, or on or by any digital storage medium or by any

**93.** *Flonnory v. State*, 893 A.2d 507, 535 (Del. 2006) (citing *Grace v. State*, 658 A.2d 1011, 1015 (Del.1995)). It is unclear whether Sisson actually raised his due process claim before the trial judge. The State does not suggest that we should review this issue for plain error. Instead, the State concedes that our standard of review for all of Sisson's arguments on appeal is *de novo*.

**94.** U.S. Const. amend V; Del Const art. I, § 8.

**95.** *Williams v. State*, 796 A.2d 1281, 1285 (Del.2002) (citations omitted).

**96.** *Feddiman v. State*, 558 A.2d 278, 288 (Del. 1989) (quotation and citation omitted); *Williams*, 796 A.2d at 1285.

**97.** *Feddiman*, 558 A.2d at 288; *Williams*, 796 A.2d at 1285.

**98.** *Handy v. State*, 803 A.2d 937, 940 (Del. 2002) (quotation and citation omitted).

**99.** *Id.* at 941.

**100.** *Id.* at 941, n. 9 quoting *State v. Westling*, 145 Wash.2d 607, 40 P.3d 669, 671 (2002) ("Thus, when a defendant is convicted of multiple violations of the same statute, the double jeopardy question focuses on what 'unit of prosecution' the Legislature intends as the punishable act under the statute.")

other electronic means which is capable of conversion into a visual image; or

(3) Any picture, or computer-generated image or picture, or any other image whether made, stored or produced by electronic, digital, mechanical or other means.[101]

Before the trial judge, Sisson focused on the first clause of § 1108(1) (particularly the phrase "knowingly, photographs or films") to argue that the statute criminalized a course of conduct (the "photo session") rather the act of creating each individual visual depiction. The trial judge correctly rejected this argument. He concluded that the second clause of § 1108(1) ("or otherwise knowingly creates a visual depiction"),[102] coupled with the definition of visual depiction in § 1103 that was added at the same time, rendered the first clause of § 1108 surplusage.[103] As the trial judge noted:

as a result of the 2000 amendments, the phrase "photographs or films," as used in the first clause of Section 1108(1), was subsumed within the phrase "creates a visual depiction," as it appears in the second clause, because a "visual depiction," by statutory definition, includes a "photograph" or "film." [104]

We agree with the trial judge's persuasive analysis and with his conclusion. Because under § 1103 "each separate photograph, motion picture, or digitally created image is a single 'visual depiction,' " [105] the legislative intent in § 1108 is very clear. The statute criminalizes each individual act of creating a single visual depiction.[106] Interpreting similar statutes, other courts have reached this same conclusion.[107] That interpretation is consistent with our interpretation of the companion statutes 11 Del. C. § 1109 and § 1111 in *Fink v. State*.[108]

---

**101.** 11 Del. C. § 1103(g).

**102.** The legislature added that clause in July 2000 in an attempt to ensure that the criminal code could meet the challenges posed by new technology.

**103.** *Sisson II*, 883 A.2d at 72 (citing 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction*, § 47.37, at 387–88.).

**104.** *Id.*

**105.** *Id.* at 71.

**106.** *See Id.* ("the creation of each 'visual depiction' . . . is a separate criminal offense.").

**107.** *See State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002) (split panel)(collecting cases); *Williams v. Commonwealth*, 178 S.W.3d 491 (Ky.2005). *But see State v. Root*, 141 Wash.2d 701, 9 P.3d 214 (Wash.2000). Before the trial judge, Sisson argued that *Root* was analogous. On appeal, he cited *Root*, but appears to have abandoned the argument that *Root* is analogous. In any event, we are satisfied that the trial judge appropriately distinguished *Root*. *See Sisson II*, 883

A.2d at 73–74. *But see also Wilson v. State*, 114 P.3d 285 (Nev.2005).

**108.** 817 A.2d 781 (Del.2003). In *Fink* we noted:

Both 11 Del. C. § 1109(4) and § 1111(1) use the term "visual depiction" in the singular. The clearest reading of the statutes is that each individual "visual depiction" of child pornography that is knowingly "dealt" or possessed by a defendant constitutes the basis for a separate offense under the statutes. Accordingly, in this case, [the defendant's] possession of multiple photographs depicting child pornography constituted multiple violations of both the dealing and the possession statute. *Id.* at 788.

§ 1108(1) also uses the term "visual depiction" in the singular. Like § 1109(4) and § 1111(1), we are satisfied that the clearest reading of § 1108 is that each individual "visual depiction" that the defendant knowingly creates constitutes the basis for a separate offense. *Reading the statute and the statutory scheme as a whole*, rather than nit-picking through individual sections, Sisson's attempt to distinguish *Fink* by citing the word "any" in § 1109(4) is unavailing. In *Fink* we clearly

Sisson's "absurd result" argument does not convince us otherwise. Sisson argues that if we interpret the statute to criminalize each act of creating a visual depiction (the per-visual-depiction unit of prosecution) rather than each "photo session" (the per-photo-session unit of prosecution), resulting in numerous visual depictions, it will lead to absurd results. Sisson points to two of such potential "absurd" results. The first we can dismiss very readily.

Sisson first posits that under the per-visual-depiction unit of prosecution:

> [T]wo defendants who share the same criminal intent and, at the same time, photograph [or film] the same victim engaged in prohibited sexual acts could be charged with widely varying numbers of crimes. For example, one defendant can take up to 24 still pictures in one second with a "motion picture," [or video camera] amounting to 14,400 images in ten minutes. [citation omitted] The other defendant, however, can only take a significantly fewer number of still pictures with a still camera in that same second [or ten minute time period]. [citation omitted]. Under the [per-visual-depiction unit of prosecution], the first defendant [who used a video camera] could be charged with up to 14,400 counts of Sexual Exploitation . . . while the other [who used a still camera] could be charged with a significantly fewer number of counts. . . .

Under the statute as written, this hypothetical example simply can never occur in reality. The act of taking a ten-minute video or "motion picture" creates *one* visual depiction (the ten-minute video), not 14,400 still pictures. For purposes of a motion picture visual depiction, we look to the whole visual depiction, not to the sum of its parts. This is not to say that a defendant who took one ten-minute motion picture video and then, using digital editing software, created 20 still pictures from the motion picture could only be charged with one count under § 1108. That defendant could be charged with 21 counts: 1 for the video and 20 for each still picture created from the video. Capturing single still frames from a video falls within § 1108's language of "otherwise knowingly creat[ing] a visual depiction." For these reasons, we are satisfied that the first potential absurd result is not an issue.

Sisson's second potential "absurd" result is more troubling. Under the per-visual-depiction unit of prosecution, Sisson contends, the Sexual Exploitation statute classifies offenders "based on the instrument of photography that is employed to obtain visual depictions." This classification, Sisson argues, is arbitrary, capricious, irrational and absurd, and leads to one group of sexual exploitation offenders being punished more severely than another group. For example, assume an individual, during the course of one thirty-minute "photo session," in the same location, and without interruption, takes thirty still pictures depicting a child engaged in a prohibited sexual act. Under § 1108, that person will have created thirty visual depictions. Because § 1108 is a class B felony and the sentence for a class B felony is "not less than 2 years up to 25 years" at level V, that person will be subject to a sixty-year mandatory minimum prison sentence.[109] A different person, under exactly similar circumstances, but who takes one thirty-min-

---

focused on the fact that the statutes used the term "visual depiction" in the singular, not on the term modifying "visual depiction."

**109.** 11 Del. C. § 4205(b)(2) ("The term of incarceration which the court may impose for a felony is fixed as follows . . . For a class B felony *not less* than 2 years up to 25 years to be served at level V.") (emphasis added).

312

ute motion picture or video will be punished less severely. That latter person will have created one visual depiction and can receive from two to twenty-five years at Level V. Even if the second person receives the maximum, he would receive only twenty-five years, as opposed to the first person's sixty years. According to Sisson, it is absurd to sentence the first person (the still photographer) more harshly than the second person (the "videographer") because they shared similar criminal intents and engaged in similar acts, but merely used different instruments to create the respective visual depictions.

The trial judge considered a variant of this argument below and ultimately rejected it. Before the trial judge, Sisson characterized the possibility that a person who took one still image could be sentenced the same as a person who took *one* video as a "practical loophole in the statute." The trial judge noted:

> [W]hat may appear, at first glance, to be a statutory loophole can easily be remedied at sentencing. Among the factors in aggravation of the crime that the court may consider when determining an appropriate sentence are the circumstances surrounding the creation of the "visual depiction," including the length of a filming session, and the nature of the end-product itself.[110]

With respect to a single visual depiction, the trial judge is assuredly correct. Trial judges have the discretion to sentence a person convicted of creating one still picture of a child engaged in a prohibited sexual act to the minimum mandatory of two years and, based on the surrounding circumstances, have the discretion to sentence a person convicted of creating one video of a child engaged in a prohibited sexual act to up to twenty-five years.

Even so, this does not solve the problem of creating parity between the person convicted of taking thirty still photographs in one photo session over a thirty-minute period (who receives a mandatory minimum of sixty years) and the person convicted of taking one thirty-minute video in the same photo session (who can receive a minimum of two years up to a maximum of twenty-five years).

At first blush, this potential disparity does seem absurd. Intuitively, a thirty-minute video of a child engaged in a prohibited sexual act, presumably with audio and obviously with motion, seems more repugnant than thirty still photographs. Drawing from this seeming absurdity, Sisson suggests that we should adopt the analysis applied in *Feddiman*,[111] considering the time, location, or intended purpose of the criminal conduct under the totality of the circumstances. Doing so would require interpreting the statute to create a per-photo-session unit of prosecution. But that, according to Sisson, would be a more rational approach, and would eliminate the disparate treatment of the still photographer who takes thirty pictures in thirty minutes and the videographer who takes one thirty minute video.

We decline to adopt this totality of the circumstances approach and the corresponding per-photo-session unit of prosecution because, upon a closer examination of the purposes of the statute, this disparity makes perfect sense. The legislature was obviously concerned with curtailing the proliferation of child pornography. The per-visual-depiction unit of prosecution more effectively serves this purpose than does the per-photo-session unit of prosecution, and the legislature could have so rationally concluded. The legislature

110. *Sisson II,* 883 A.2d at 75.

111. 558 A.2d at 289.

could have rationally concluded that to deter such proliferation it should focus on the number of visual depictions rather than their content or their method of creation. The more instances of visual depictions in existence, the higher the possibility for the proliferation of child pornography. It is easier to circulate thirty still pictures to other collectors of child pornography, whether the pictures are digital (and stored in a computer's hard drive) or physical, than it is to circulate one thirty-minute physical or digital video. In other words, the legislature could have concluded that thirty individual pictures, each of which could be used for self-gratification or, worse, for a profit, would be more pernicious than one thirty-minute film, because the pictures can be copied and repeatedly posted more easily and widely than the film, and therefore might reach an overall larger audience than one film. § 1108 looks not only to the act of creating a visual depiction of a prohibited act of child pornography, but also to the end product of that exploitation, the visual depiction itself. Using the per-photo-session unit of prosecution rather than the per-visual-depiction unit of prosecution would undermine the legislature's goal of curtailing the overall proliferation of visual depictions of child pornography by essentially giving the still photographer a volume discount on crime.

As mentioned above, § 1108 is broad enough to cover the situation of a person who takes a thirty-minute video and then uses the video as the raw material to create thirty still photographs depicting prohibited sexual acts by capturing single video frames. Such a person would be punished as severely as the still photogra-

pher who directly creates thirty still photographs using a camera. In short, what matters is not the method of creating the visual depictions, but the number of the visual depictions created, using whatever method, because "[e]ach picture is a crime against the child depicted as well as an offense to society."[112] Given the legislature's concern with the proliferation of child pornography using new and old technology, we conclude that the legislature had a rational basis for looking to the end product of the exploitation to set forth the per-visual-depiction unit of prosecution under § 1108. Because this interpretation of the statute does not lead to an absurd result, we reject Sisson's statutory interpretation argument.

## B. Due Process and Equal Protection

Sisson's final argument on appeal is that § 1108 and its per-visual-depiction unit of prosecution violate the Equal Protection and Due Process Clauses of the United States Constitution.[113] Sisson argues that § 1108 punishes one group of sexual exploitation offenders (those who use a still camera) more severely than another group (those who use a video camera). According to Sisson, the statute classifies offenders into separate categories "based on the instrument of photography that is employed to obtain the visual depictions." Imposing a harsher penalty on a person who uses a still camera than on a person who uses a video camera is allegedly irrational, arbitrary, and capricious. Moreover, Sisson contends, because the classifications are not rationally related to the purpose of the statute, which Sisson admits is to prevent the creation of child

---

112. *Fink,* 817 A.2d at 788.

113. Sisson makes no reference to the Delaware Constitution. Thus we will consider only his federal constitutional claims. *See*

*Ortiz v. State,* 869 A.2d 285, 291 n. 4 (Del. 2005) ("Conclusory assertions that the Delaware Constitution has been violated will be considered to be waived on appeal").

pornography, the statute violates the Due Process clause.

 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution protects against arbitrary and capricious classifications, and requires that similarly situated persons be treated equally.[114] "Equal protection does not require identical treatment for all individuals within a class but, rather, when distinctive treatment for individual class members does occur, there must be a reasonable basis for the distinction."[115] For the distinction to be unconstitutional, "the distinction must be patently arbitrary and bear no rational relationship to a legitimate governmental interest."[116] Moreover, "due process ... requires that a statutory provision be rationally related to its purpose."[117]

> In determining whether a statutory classification, not involving a suspect class or fundamental right, violates the equal protection [or due process] clause, we presume that the distinctions so created are valid. A statutory discrimination or classification will not be set aside if any state of facts reasonably may be conceived to justify it.[118]

Sisson suggests that the statute creates two groups of persons who create visual depictions of children engaged in prohibited sexual acts: photographers and videographers. Photographers are allegedly punished more severely. As we read the statute, each class is punished the same. For each visual depiction created, whether it be a still photograph from a camera, a movie from a video camera, or even a still photograph created from a movie using editing software, the creator of the visual depiction has committed one act violating § 1108. If that is what Sisson is arguing, he is wrong because there is no unequal treatment in this instance, and therefore no equal protection or due process issue.

 What we think Sisson may be attempting to argue is that the statute creates a class of photographers who take several pictures during a defined time period, on the one hand, and a class of videographers who record one video during the same defined time period, on the other. The former are punished more severely than the latter, Sisson contends, based solely on the instrument used. Sisson does not suggest that those who create visual depictions of children engaged in prohibited sexual acts are members of a suspect class. Nor does he suggest or cite any case to support the proposition that the statute and its classification interferes with a fundamental right.[119] Sisson argues only that the statute is not rationally relat-

**114.** *Hughes v. State,* 653 A.2d 241, 247 (Del. 1994); *Jackson v. Jamrog,* 411 F.3d 615, 618 (6th Cir.2005).

**115.** *Hughes,* 653 A.2d at 248.

**116.** *Id.* (citing *Gotleib v. State,* 406 A.2d 270, 275 (Del.1979); *Marine v. State,* 607 A.2d 1185 (Del.1992)); *See State v. Virdin,* 1999 WL 743988, 1999 Del.Super. LEXIS 358 (Del.Super.Ct.1999) (Ridgely, P.J.) (citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

**117.** *Hughes,* 653 A.2d at 248 citing *State v. Hobson,* 46 Del. 381, 83 A.2d 846 (Del.1951).

**118.** *Hughes,* 653 A.2d at 247 (citation omitted).

**119.** *Virdin,* 1999 WL 743988, 1999 Del.Super. LEXIS 358, at *6 ("Furthermore, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. The statute presently under attack does not raise issues of race, alienage, or national origin and is therefore not subject to the strict scrutiny analysis which is required in such circumstances. Nor does the statute involve gender discrimination, and a heightened standard of review....") (quotation omitted) (citing *inter alia Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Cle-*

ed to its purpose, and that the legislature created the separate videographer/photographer classification arbitrarily and capriciously. Therefore we must determine only whether the statute is rationally related to a legitimate state interest. As discussed at length above, the legislature could have rationally concluded that the unit of prosecution should be per-visual-depiction in order to curb the proliferation of the number of visual depictions of child pornography in Delaware. Because the legislature had a rational basis for reaching this conclusion and because curbing the proliferation of child pornography is a legitimate state interest, Sisson's equal protection argument must fail. Similarly, because § 1108 is rationally related to its legitimate purpose of preventing the creation of child pornography, Sisson's due process argument must fail as well.

### CONCLUSION

For the foregoing reasons, Sisson's convictions and the judgments of the Superior Court are **AFFIRMED.**

burne, 473 U.S. at 440, 105 S.Ct. 3249.) *See Jackson,* 411 F.3d at 618 ("[S]tatutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest.")