IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MAURICE COOPER, | § | |
| | § | No. 261, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID. No. 1801007017 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 12, 2020
Decided: April 15, 2020

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

James F. Brose, Esquire (*Argued*), The Brose Law Firm, Media, Pennsylvania, Stephanie Volturo, Esquire, and Jan A. T. van Amerongen, Jr., Esquire, Office of Conflicts Counsel, Wilmington, Delaware for Appellant, Maurice Cooper.

Sean P. Lugg, Esquire (*Argued*), Delaware Department of Justice, Wilmington, Delaware, for Appellee, the State of Delaware.

**VAUGHN**, Justice:

The Appellant, Maurice Cooper, was convicted in the Superior Court of Drug Dealing (Heroin), Aggravated Possession of Heroin, four counts of Possession of a Firearm During the Commission of a Felony, four counts of Possession of a Firearm by a Person Prohibited, and two counts of Possession of Ammunition by a Person Prohibited. On appeal, he makes four claims. First, he claims the Superior Court erred by denying his motion to suppress evidence discovered when the police searched a business location known as 3607 Downing Drive, Unit 8, Wilmington, Delaware (Unit 8). Specifically, he claims that the facts set forth in the application for a search warrant for the premises failed to establish a sufficient nexus between the evidence sought and Unit 8. Second, he claims the Superior Court erred by denying his motion to suppress evidence discovered when the police searched a residential unit known as 2338 W. 18th St., Apartment 1, Wilmington, Delaware (Apartment 1). His challenge to the search warrant for that premises is the same – he claims that the application for the warrant failed to establish a sufficient nexus between the evidence sought and Apartment 1. His third claim is that the Superior Court erred by denying his motion to suppress evidence retrieved from his Instagram account pursuant to two search warrants. Specifically, he claims that the evidence from the Instagram account should have been suppressed because the search warrants for the account were based, in part, on information obtained during the allegedly unlawful searches of Unit 8 and Apartment 1. Finally, he contends that

his sentence violated his constitutional protection against cruel and unusual punishment. We find no merit to Cooper's claims and affirm.

## I. FACTS

The investigation which ultimately led to Cooper's arrest began in 2014 when police received information that numerous individuals in the City of Wilmington, specifically the Riverside Housing Projects, were working in collaboration to distribute large quantities of heroin, cocaine, and marijuana throughout the City of Wilmington. The police developed information, primarily through informants, that Cooper was a large scale heroin dealer in the Riverside Section of the City, had been observed in possession of weapons on numerous occasions, and had been involved in multiple acts of violence, including exchanges of gun fire.

The facts directly relevant to Cooper's appeal took place in December 2017 and January 2018. In December, the police were contacted by Confidential Informant No. 5 (CS5), who gave police the following information as set forth in the applications for the warrants to search Unit 8 and Apartment 1:

> Your affiant can truly state that during the month of December 2017 SA Haney with the FBI Task Force was contacted by a past proven and reliable confidential informant, herein CS5, who advised that s/he is familiar with a subject identified as Maurice "Coop" Cooper. CS5 advised that s/he can purchase heroin and/or weapons from Cooper. Furthermore, that Cooper has shown CS5 a large cache of weapons on multiple occasions that included a rifle, tec9, and handguns. CS5 advised that s/he has observed Coop with the weapons inside what appeared

3

to be a residence and also inside what appeared to be a car detailing shop. CS5 advised that the shop was somewhere along Governor Printz Boulevard. SA Haney and your affiant have viewed weapons from the cache as some were photos sent from one of Maurice Cooper's social media accounts.[1]

During the third week of December 2017, the police received additional information from Confidential Informant No. 1 (CS1). The information received from CS1 was set forth in the applications for the warrants to search Unit 8 and Apartment 1 as follows:

> Your affiant can truly state that during the third week of December 2017 your affiant was contacted by CS1 who advised that Maurice Cooper was in possession of a firearm with a large capacity magazine. The informant described the weapon as similar to a mac10, but concealable in a jacket with a large "banana clip" style magazine. This description fits the description of the tec9 weapon that Cooper showed to CS5.[2]

Previously, in June 2017, the police first noticed that Cooper had registered one of his vehicles to the Apartment 1 address. Through spot checks, they later observed vehicles belonging to Cooper parked near Apartment 1. Further information connecting Cooper to Apartment 1 was developed in September 2017 when the Office of Animal Welfare for New Castle County responded to Apartment 1 to investigate an animal welfare complaint. A representative from the Animal Welfare Office found Cooper in Apartment 1. Cooper let him in and showed him

---

[1] Second Amended App. to Amended Opening Br. A55, A65 [hereinafter A_].
[2] A56, A66.

cages where dogs were kept in the basement. The complaint was cleared with no action taken, but the incident was documented in a report.

In October 2017, Cooper again registered a vehicle to the Apartment 1 address. The police observed the vehicle parked outside Apartment 1 on numerous occasions.

During the first week of January 2018, Cooper and another individual were observed by an undercover police officer purchasing gun cleaning equipment at a Walmart store. During that same week, the police decided to follow up on CS5's claim that s/he could purchase heroin and/or weapons from Cooper. At police instruction, CS5 contact Cooper by phone to arrange such a purchase. Cooper responded by agreeing to sell heroin and a firearm to CS5. They agreed on a date, time and location. When the time came, the police established surveillance at Apartment 1. They observed Cooper exit Apartment 1 carrying a white shopping bag. Continuing their surveillance, they watched as Cooper then drove to 3607 Downing Drive, which is a small industrial complex along Governor Printz Boulevard with a car detailing shop inside. The complex consists of eight single story units, all attached, with store front doors along the front of the building. Cooper parked in front of Unit 8. While standing outside the building, he called CS5 by cell phone to confirm the transaction. He then entered Unit 8 for a short time. When he exited Unit 8, he was wearing a large puffy jacket. He then drove directly

to the predetermined meeting location and sold heroin and a firearm to CS5 in exchange for U.S. currency provided to CS5 by the police for that purpose. After the transaction was completed, the parties separated and CS5 went to another predetermined location where s/he met with the police and handed them the heroin and the firearm.

Cooper is a person prohibited from possessing a firearm or firearm ammunition because of past felony convictions.

The police then applied for search warrants to search Unit 8 and Apartment 1 for drugs and firearms. All of the foregoing facts are recited in the applications for the warrants. The applications also recited that drug traffickers maintain large amounts of U.S. currency to finance their ongoing business, that it is common for drug traffickers to secret proceeds of illegal drug sales and records of drug transactions within their residence and/or business, and that drug traffickers transport only enough drugs to complete a particular sale and maintain other drugs at secure locations, including their residence. The applications are identical except for the identification of the location to be searched. They were presented to a judge of the Superior Court, who then issued the warrants.

Three days later, on January 15, 2018, officers executed the search warrants and arrested Cooper. In Apartment 1, the officers found items which confirmed that the apartment was occupied by Cooper. They also found a Springfield SC

6

semiautomatic handgun and several thousand dollars bundled together. In Unit 8, they found a Ruger handgun with extended magazine, a large quantity of packaged heroin and U.S. currency, a Daniel defense AR-15 rifle with four magazine clips containing various quantities of rifle ammunition, a Maverick 12-guage shotgun, several boxes of 9-millimeter ammunition, and a large quantity of raw heroin.

On July 6, 2018, police officers applied for and received a warrant to search Cooper's Instagram account for the time period from November 25, 2017 to January 15, 2018. The application restated the same investigative facts used to obtain the warrants to search Unit 8 and Apartment 1. In addition, it included the results of the searches of those locations. It also elaborated on the statement in the original applications that "SA Haney and your affiant have viewed some of the weapons from the cache as some were photos sent to CS5 from Maurice Cooper's [I]nstagram account."[3] The application explained that CS5 had provided the photos and they came from Cooper's Instagram account. It further explained that the weapons in those photos were the same as the weapons seized in the searches at Unit 8 and Apartment 1. The execution of this warrant yielded additional information related to Cooper's possession of weapons.

On October 23, 2018, police officers applied for and received a second warrant to search Cooper's Instagram account for the time period between May 18,

---

[3] A73.

2017 and January 15, 2018. The application for the second Instagram account warrant contained essentially the same information as the application for the first Instagram account warrant, except that it also included information relating to weapons that were discovered as the result of viewing information gained from the July 6, 2018 warrant. The execution of the second Instagram warrant yielded additional incriminating information.

Cooper filed pre-trial motions to suppress the evidence obtained as a result of the searches of Unit 8, Apartment 1 and the Instagram account. His motions were denied.

Following his convictions, Cooper was sentenced to a total of 75 years of unsuspended Level 5 time.

## II. STANDARD OF REVIEW

This Court generally reviews a denial of a motion to suppress for abuse of discretion.[4] "Where the facts are not disputed and only a constitutional claim of probable cause is at issue, we will review the Superior Court's application of the law of probable cause *de novo*."[5]

Appellate review of the sufficiency of an affidavit in support of a search warrant, however, is not *de novo*. In *Jensen v. State*, this Court held that "[a]

---

[4] *Smith v. State*, 887 A.2d 470, 472 (Del. 2005) (en banc).
[5] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006) (en banc).

determination of probable cause by the issuing magistrate will be paid great deference by a reviewing court and will not be invalidated by a hypertechnical, rather than a common sense, interpretation of the warrant affidavit."[6]

This approach is consistent with the standard applied by the United States Supreme Court. As the Supreme Court explained in *Illinois v. Gates*:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." "A grudging or negative attitude by reviewing courts toward warrants," is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant "courts should not invalidate … warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense manner."[7]

Since *Jensen*, we have repeated this standard of review.[8]

## III. DISCUSSION

## I

Cooper's first two claims challenge the sufficiency of the applications for the warrants to search Unit 8 and Apartment 1. Cooper contends that the applications do not contain sufficient facts to connect either Unit 8 or Apartment 1 to the evidence sought.

---

[6] 482 A.2d 105, 111 (Del. 1984).
[7] 462 U.S. 213, 236 (1983) (first alteration added) (citations omitted).
[8] *E.g.*, *LeGrande v. State*, 947 A.2d 1103, 1108 & n.12 (Del. 2008) (en banc); *Sisson*, 903 A.2d at 876; *Smith*, 887 A.2d at 473.

Probable cause exists where, in light of the totality-of-the-circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[9] To establish probable cause sufficient for a magistrate to issue a search warrant, an affidavit "must, within [its] four corners . . . , set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place."[10] Otherwise stated, the affidavit must establish sufficient facts "permit[ting] an impartial judicial officer to reasonably conclude that the items sought would be found in those locations. In determining whether probable cause has been demonstrated, there must be a logical nexus between the items sought and the place to be searched.[11]

In measuring the totality of the circumstances when an informant's tip is involved, this Court considers "the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[12] "If the informant's tip can be corroborated, the tip may establish probable cause, even where nothing is known about the informant's credibility."[13]

---

[9] *Bradley v. State*, 204 A.3d 112, 2019 WL 446548, at *6 (Del. Feb. 4, 2019) (ORDER).
[10] *Id.*
[11] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000) (en banc) (emphases and footnote omitted).
[12] *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013) (en banc).
[13] *Tolson v. State*, 900 A.2d 639, 643 (Del. 2006) (en banc).

In this case, the information provided by CS5 was substantially corroborated by independent police surveillance and information. CS5 informed the police that s/he had seen Cooper in possession of weapons on multiple occasions at two locations, one inside what appeared to be a residence and the other at what appeared to be a car detailing shop "somewhere along Governor Printz Boulevard." The police were able to corroborate that Cooper was in possession of weapons from photos sent from one of Cooper's social media accounts. In addition, shortly after the police received the information from CS5, CS1 gave the police a description of a weapon possessed by Cooper which fit the description provided by CS5 of a tec9 weapon possessed by Cooper, and an undercover police officer observed Cooper buying gun cleaning equipment. Perhaps most importantly, the fact that CS5 was able to complete a controlled purchase of drugs and a weapon from Cooper under police surveillance corroborates that s/he had knowledge of Cooper's criminal behavior and justified the issuing judge in concluding that CS5 and the information s/he provided was reliable. The time-frame from the receipt of information from CS5 and the searches was less than two months. The information CS5 provided, as corroborated by independent police surveillance and information, was sufficient to establish a reasonable belief that Cooper unlawfully possessed weapons at two locations at the time the warrants were sought, one being a residence, and the other

11

being a location somewhere along Governor Printz Boulevard that contained an auto detailing shop.

Cooper contends that the affidavit does not establish a nexus between the "apparent residence" referred to by CS5 and Apartment 1; that the residence observed by CS5 could have belonged to anyone; that CS5 provided no address for the residence; and that CS5 did not connect Cooper to Apartment 1 in any way. The police, however, independently determined that Apartment 1 was Cooper's only known residence through motor vehicle records, records of the Office of Animal Control, surveillance of vehicles belonging to Cooper outside Apartment 1, and surveillance of him leaving Apartment 1 on the day of the controlled transaction with CS5. The information police developed through their investigation was sufficient to permit the issuing judge to form a reasonable belief that Apartment 1 was the residence where CS5 observed Cooper with weapons, and that weapons, which Cooper was prohibited from possessing, would be found there when the search was conducted.

Cooper contends that the affidavit also lacked sufficient facts to connect Unit 8 to what CS5 described as an apparent car detailing shop somewhere along Governor Printz Boulevard. He argues that the tip CS5 provided was vague, with no address provided, no crossroad set forth, no description of the surrounding area, no description of the type of building, no name of a mall or complex, no store sign,

12

no landmark, or anything useful to identify where CS5 saw the weapons other than at what appeared to be a car detailing shop somewhere along Governor Printz Boulevard. The application fails to describe Unit 8, he argues, as a car detailing shop, and fails to contain any information that CS5 was shown Unit 8 before the search and before s/he corroborated that it was the same place where s/he saw Cooper with weapons.

While CS5's description of the location along Governor Printz Boulevard where s/he saw Cooper with weapons may not have been enough, standing alone, to create a logical nexus between Cooper's weapons and Unit 8, we think the officers' first-hand observations of Cooper on the day of the controlled purchase coupled with CS5's tip are sufficient to create such a nexus. Interpreting the application in a commonsense, rather than a technical manner, the judge issuing the warrant could reasonably conclude that there was a similarity between the location CS5 described and the location where the police saw Cooper stop just before proceeding to his rendezvous with CS5. The officers' observations of Cooper stopping by Unit 8 on the way to meet CS5; calling CS5 to confirm the sale while standing just outside the Unit; entering the Unit after confirming the sale and exiting after a brief period wearing a large, puffy jacket; and then proceeding directly to complete the sale to CS5, coupled with CS5's tip, were sufficient to create a reasonable belief that Unit 8 was the actual location where CS5 had seen Cooper with weapons.

For these reasons, we conclude that the facts and circumstances set forth in the applications were sufficient to permit the judge issuing the warrants to reasonably find that the items sought would be found in Apartment 1 and Unit 8.

Cooper's third claim, which challenges the search warrants for his Instagram account, is predicated upon our finding that the searches of Unit 8 and Apartment 1 were not supported by probable cause. Since we reject Cooper's challenges to the warrants for Unit 8 and Apartment 1, it follows that his challenges to the Instagram warrants are also rejected.

## II

Cooper's final claim is that his sentence violates his constitutional protection against cruel and unusual punishment.

The Eighth Amendment to the U.S. Constitution, as applied to the states by the Fourteenth Amendment, prohibits "cruel and unusual punishment."[14] As this Court has previously recognized, "[t]he Eighth Amendment . . . contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"[15]

The jury convicted Cooper of Drug Dealing (Heroin), Aggravated Possession of Heroin, four counts of Possession of a Firearm During the Commission of a Felony (PFDCF), four counts of Possession of a Firearm by a Person Prohibited

---

[14] U.S. CONST. amend. VIII.
[15] *Crosby v. State*, 824 A.2d 894, 904 (Del. 2003) (en banc).

(PFBPP), and two counts of Possession of Ammunition by a Person Prohibited (PABPP). For sentencing purposes, the Superior Court merged the Aggravated Possession charge into the Drug Dealing (Heroin) charge. The Court imposed 15 years of unsuspended Level V imprisonment on the Drug Dealing (Heroin) charge. It imposed a minimum mandatory sentence of five years of unsuspended Level V imprisonment on each of the PFDCF charges. It imposed a minimum mandatory sentence of ten years of unsuspended Level V imprisonment on each of the PFBPP charges. It imposed a probationary sentence on each of the PABPP charges. The four minimum mandatory terms on the PFDCF charges are required by statute to be served consecutively to each other and any other Level V sentence.

An issue at sentencing was whether the four, ten year minimum mandatory sentences for PFBPP could be served concurrently with each other and the other Level V sentences. The sentencing judge found it unnecessary to address that issue, because, as he indicated in his sentencing remarks, he thought that Cooper's sentences should all be served consecutively. As a result of all sentences being made consecutive to each other, Cooper received a combined term of imprisonment of 75 years.

The sentencing judge acted within his discretion in deciding that Cooper's sentences should be served consecutively, rather than concurrently where permitted.

The issue before us is whether the punishment imposed was cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

We discussed the requirements of the Eighth Amendment's prohibition against cruel and unusual punishment in *Crosby v. State*.[16] We quoted with approval Justice Kennedy's reasoning in his concurring opinion in *Harmelin v. Michigan* that the Eighth Amendment "forbids only extreme sentences that are grossly disproportionate to the crime."[17] Following the reasoning of Justice Kennedy's opinion, we concluded that a proportionality review is limited to the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."[18] A proportionality analysis is called for only when that threshold is crossed.

This is not one of those rare cases where the sentences imposed lead to an inference of gross disproportionality. Cooper has engaged in serious and dangerous felony conduct for which the legislature has justifiably created substantial penalties. He was apprehended with a substantial quantity of heroin and in unlawful possession of a cache of firearms and ammunition. His prior felonies include Murder in the Second Degree and Robbery in the First Degree. *Crosby*, by contrast, received a life

---

[16] *Id*. at 904-07.

[17] *Id*. at 906 (quoting 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment)).

[18] *Id*. at 907 (quoting *Harmelin*, 501 U.S. at 1005 (Kennedy, J., concurring in part and concurring in the judgment)).

sentence for the non-violent crime of Forgery in the Second Degree.  Since the sentences imposed on Cooper do not create an inference of gross disproportionality to his crimes, they do not violate the Eight Amendment.

The judgment of the Superior Court is affirmed.