# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **I.D. No.  2109010261** |
| | ) | |
| **KHALIL DIXON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Submitted: November 10, 2025
Decided:  November 17, 2025

**Memorandum Opinion**


*On Dixon's Motion to Suppress the January 29, 2020, March 30, 2020, and May 13, 2020, Instagram Search Warrants –* **GRANTED in part, DENIED in part**

*On Dixon's Motion to Suppress the AT&T March 24, 2021, Search Warrant –* **GRANTED in part, DENIED in part**

*On Dixon's Motion for Leave to File Suppression Out of Time –* **GRANTED**

*On Dixon's Motion to Suppress the March 19, 2021, Instagram Search Warrant –* **DENIED**

*On Dixon's Motion in Limine to Exclude Expert William Shute –* **DENIED**


Jamie McCloskey, Esquire, and Erica Flaschner, Esquire, Deputy Attorneys General, Department of Justice, *attorneys for the State*

James J. Haley, Jr., Esquire, Ferrara & Haley, Wilmington, Delaware, *attorney for Defendant*


**BRENNAN, J.**

Khalil Dixon (hereinafter "Dixon") was indicted on September 27, 2021, and charged with Murder First Degree, Conspiracy First Degree, Criminal Solicitation First Degree, Money Laundering, and Conspiracy Second Degree for the February 25, 2020, murder of Shiheem Durham.[1] Dixon and his co-defendant Jason Calhum (hereinafter "Calhum") were tried together on May 17, 2022.[2] On June 8, 2022, a jury found Dixon and Calhum guilty of all charges.[3] On August 24, 2022, Calhum moved for a new trial based upon juror misconduct.[4] Dixon joined this Motion on September 14, 2022.[5] Following extensive review, on February 5, 2025, the Court granted the joint motion and ordered a new trial. Trial is set to begin on December 1, 2025.[6]

On August 20, 2025, Dixon filed four (4) motions: a Motion to Suppress the Instagram Search Warrants dated January 29, 2020, March 30, 2020, and May 13, 2020,[7] a Motion to Suppress a March 24, 2021, Search Warrant to AT&T in the Matter of: (302) 608-4874 (hereinafter "the AT&T warrant"),[8] a Motion to Sever his

---

[1] *State v. Dixon*, Superior Court Criminal ID No. 2109010261, Docket Index (hereinafter "D.I.") 1.
[2] D.I. 39.
[3] D.I. 39, 41.
[4] *State v. Calhum*, Superior Court Criminal ID No. 2004002081, D.I. 123, Def. Mot. for New Trial.
[5] D.I. 63.
[6] D.I. 103, 120. Following the grant of the new trial, the original trial judge retired and the undersigned Superior Court judge was assigned to preside over this matter.
[7] D.I. 127.
[8] D.I. 128.

trial from Calhum's,[9] and a Motion to Dismiss for Speedy Trial Violation.[10]  On October 10, 2025, Dixon filed a Motion in *Limine* to exclude Federal Bureau of Identification (hereinafter "FBI") Special Agent (Ret.) William Shute's (hereinafter "Shute") testimony,[11] and a Motion *in Limine* to exclude Instagram messages and text messages as not properly authenticated under D.R.E. 901.[12]

On October 22, 2025, a hearing was held to address Dixon's then-pending motions.[13]  Following that hearing, both the Motions to Dismiss and to Sever were denied in a bench ruling.   The Motion *in Limine* regarding the Instagram messages was denied without prejudice, as premature, given that the State has a continuing obligation to lay a foundation for any such evidence at trial.[14]

At that hearing, counsel advised the Court of Dixon's intention to file another suppression motion for a 2021 Instagram warrant, out of time.  Dixon was instructed to move to file out of time in a written motion, cite the support for out of time consideration, and attach the proposed suppression motion to his request.[15]   In accordance with this direction, Dixon filed his Motion for Leave to File Motion to

---

[9] D.I. 129.
[10] D.I. 130.
[11] D.I. 146.
[12] D.I. 147.
[13] D.I. 150.
[14] *Id*.
[15] *Id.*

Suppress on October 28, 2025.[16]  The State responded in opposition.[17]  Without ruling on the motion for leave, the Court requested the State respond to the desired Motion to Suppress.[18]  The State's response in opposition was received on November 10, 2025.[19]  On November 10, 2025, an evidentiary hearing was held on the admissibility of Shute's testimony.[20]

All matters are now ripe for decision.  This is the Court's decision on all of Dixon's outstanding motions.

## I.    Motions to Suppress

The first of Dixon's suppression motions challenges three search warrants that returned information from what is purported to be Dixon's Instagram account.  The first warrant was signed January 29, 2020 (hereinafter "the January warrant"), the second on March 30, 2020 (hereinafter "the March warrant"), and the third on May 13, 2020 (hereinafter "the May warrant").  Dixon challenges the January warrant as an unconstitutional general warrant.  The March and May warrants were based upon information received following the result of the January warrant, therefore all parties agree that both the March and May warrants' sufficiency depends upon the challenge to the January warrant.  Should the information in the January warrant be declared

---

[16] D.I. 154.
[17] D.I. 155.
[18] D.I. 156.
[19] D.I. 158.
[20] D.I. 159.

general, the March and May warrants will likewise be suppressed; should the January warrant withstand constitutional muster, the March and May warrants stand.

Dixon next challenges a March 24, 2021, search warrant to AT&T (hereinafter "AT&T warrant") which sought information seeking cell tower data for the cellular number (302) 608-4874 during the timeframes: February 25, 2021, at 12:00 a.m., through February 26, 2020, 12:00 a.m. and from March 2, 2020, at 12:00 a.m., through 22:59 p.m. on the AT&T network. Dixon challenges this warrant as violative of his constitutional rights and seemingly argues the warrant is general, or alternatively, overbroad.

In his late filed motion, Dixon seeks leave to file an additional suppression motion challenging a March 19, 2021, warrant. This warrant sought information regarding the Instagram account "levelup_lil" which is purportedly attributed to Dixon. Dixon seeks to challenge this warrant as unconstitutionally general and overbroad. Other than arguing that since his first trial, the Supreme Court of Delaware decided *Terreros v. State*,[21] Dixon offers no justifiable reason for this new motion to be considered beyond the motions deadline, as counsel admits that it wasn't until Dixon himself requested suppression of this warrant that a motion was prepared. The State opposes the motion, pointing out that the reason for Dixon's noncompliance with the motions deadline is insufficient, and that the warrant has

[21] *Terreros v. State*, 312 A.3d 651 (Del. 2024).

4

been in the possession of defense for almost four years. Despite the very real additional burden on the Court and opposing counsel caused by this last-minute filing, the interests of justice are best furnished by review of this warrant. Therefore, the proffered Motion to Suppress will be considered. Each challenged warrant will be discussed in turn.[22]

### A. Standard of Review

When challenging the validity of a search warrant, the defense bears the burden to establish the search or seizure was unlawful or not supported by probable cause.[23] Delaware courts look to the "totality of the circumstances" within the warrant itself to determine whether probable cause exists.[24] When a search warrant is challenged, review is limited to the four corners of the affidavit to determine if sufficient facts appear on its face to establish probable cause.[25] Probable cause

---

[22] Dixon does not expressly make a claim under either the Delaware constitution or the United States Constitution in his motion but simply requests suppression citing Supreme Court of Delaware decisional case law. State constitutional claims will not be addressed when a party does not specifically articulate such a claim or otherwise fails to "indicate why the outcome would be different under the Delaware Constitution as opposed to the Fourth Amendment." *Thomas v. State*, 305 A.3d 683, 697 (Del. 2023) quoting *Womack v. State*, 296 A.3d 882, 899 n. 37 (Del. 2023). Therefore, his claims will only be addressed under the Fourth Amendment.

[23] *State v. Heck*, 2024 WL 4521809, at *4 (Del. Super. Oct. 17, 2024).

[24] *Sisson v. State*, 903 A.2d 288, 296 (citing *Fink v. State*, 817 A.2d 781, 786 (Del. 2003) (internal citations omitted)).

[25] *Sisson*, 903 A.2d at 296 (citing *Fink v. State*, 817 A.2d at 787) (internal citations omitted)).

exists when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[26]

The four corners of a warrant affidavit "must set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in [this] particular place."[27] The four corners determination may only be supported "by the facts set forth within the warrant affidavit or application."[28] Great deference is to be given by the reviewing court to the decision of the authorizing judicial officer.[29]

### 1.    The January, March & May, 2020, Instagram Warrants.

On January 29, 2020, in relation to a series of shootings in the Capital Park neighborhood in Dover, Delaware State Police sought one warrant seeking information on multiple suspect Instagrams accounts.  This group warrant sought "any and all records, recordings, or files related to Instagram users junglebabymir, dotified and levelup_lil," as well as for information on Facebook users Deshawn Carrol, Dot Burris and Rome Fromdajungle Wilkbank for the specified timeframe: December 10, 2019, through January 10, 2020.  Instead of separately seeking a warrant particularized for each account, Dixon's account was grouped in with the

---

[26] *Sisson*, 903 A.2d at 296 (citing *Stones v. State*, 676 A.2d 907 (Del.1996) (internal citations omitted)).
[27] *Terreros v. State*, 312 A.3d at 662.
[28] *Terreros*, 312 A.3d at 662.
[29] *Cooper v. State*, 228 A.3d 339, 404 (Del. 2020).

6

others. While there is no constitutional requirement that a separate warrant be sought for each individual request, following review of the challenged January 2020, warrant, it begs the question: had this practice been undertaken, would the information collectively known about Dixon at the time been more carefully articulated to establish probable cause?

Dixon challenges this warrant as both lacking probable cause and the required nexus between the crime and Dixon's Instagram messages. Dixon seeks suppression arguing the warrant is an unconstitutional general warrant given the laundry list of items it seeks. The warrant sought:

1.  Records concerning the identity of the account holder(s) of the above listed accounts
2.  Records concerning phone numbers associated with the registered account holder(s) of the above listed account(s)
3.  Records concerning email address(es) associated with the registered account holder(s) of the above listed account(s).
4.  Records concerning the IP address at account sign-up, logs showing IP addresses with date and time stamps for the above listed account(s).
5.  Records concerning the content of private messages in the user's inbox, draft, and sent messages, for the above listed account(s).[30]

While Dixon acknowledges the warrant contained probable cause to conclude that the string of shootings in Capital Park occurred, he argues the warrant fails to

---

[30] D.I. 127, Warrant Application, p.1. The Court quoted this warrant exactly as written and did not "sic" all punctuation errors.

establish probable cause that evidence of these crimes would be found within the "levelup_lil" Instagram account, namely in his direct messages.[31]

### a. The January 29 Warrant Is Not Unconstitutionally General.

As part of his challenge, Dixon argues that the January 2020 Instagram warrant is a general warrant. In *Terreros v. State*, the Supreme Court of Delaware found a cell phone search warrant unconstitutional for being a general warrant, as the information sought exceeded the scope of probable cause, the warrant lacked particularity, and had no temporal limit.[32] The *Terreros* Court determined the warrant was general because the request essentially encompassed all of the phone's available data by requesting information from so many aspects of the phone, only one of which was sufficiently supported by probable cause.[33] As evidence of the effective "exploratory rummaging," the Court noted the warrant's lack of temporal limitations and the use of the disfavored "any and all" language in the application's request.[34] Founded upon its previous ruling in *Wheeler v. State*,[35] the Court held that "law enforcement must provide a description of the items to be searched and

---

[31] D.I. 136, State's Resp. to Def.'s Mot. to Supp. Instagram Search Warrants at 6.
[32] *Terreros*, 312 A.3d at 651.
[33] *Id.* at 667.
[34] *Id.*
[35] *Wheeler v. State*, 135 A.3d 282, 292 (Del. 2016).

8

seized that is as specific as possible at the current investigative juncture" to ensure a warrant withstands Fourth Amendment Constitutional muster.[36]

Reviewing the January 2020 warrant, it did sufficiently describe the categories of information sought and it contained temporal limitations, requesting only information from December 10, 2019, through January 10, 2020. The five specific areas and categories of information sought from the Instagram account to be searched are articulated and do not amount to a top-to-bottom exploratory rummaging that was problematic in *Terreros* and *Wheeler*. The January 2020 warrant requested authorization to seize:

> (1) records concerning the identity of the account holder, (2) records concerning phone numbers associated with the account, (3) email addresses associated with the account, (4) records concerning IP addresses, and (5) records concerning the content of private messages.[37]

All categories were defined and had a logical nexus to the crimes to be investigated, as established in its Affidavit of Probable Cause. These requests were tailored to articulate only the areas of relevant information. Therefore, this warrant is not unconstitutionally general on its face. The problem with the warrant, however, is that while these categories are sufficiently particularized with appropriate temporal

---

[36] *Id.* at 665, *Terreros*, 312 A.3d at 665.
[37] D.I. 136, State's Resp. to Def.'s Mot. to Suppress Instagram Search Warrants, Ex. A at 18.

9

limitations, not all the categories of requested information were supported by articulated probable cause.

An overbroad warrant is one with sufficient particularity, however, lacks probable cause to support the specific requests contained therein.[38] An overbroad warrant can be redacted "to strike out those portions of the warrant that are invalid for lack of probable cause, maintaining the remainder of the warrant that satisfies the Fourth Amendment."[39] Where a police officer has the ability to set forth a precise description of the places to be searched, but instead requests what amounts to be a search of all potential information, a warrant is a general warrant.[40] Where an officer delineates and specifies the areas of the search, but it is not founded by sufficient probable cause, the warrant is overbroad.[41] The January 20 warrant is overbroad with respect to requested Items 4 and 5.

### b. Requests 4 and 5 Are Not Supported by Probable Cause.

The focus therefore turns to the "place" to be searched, Dixon's "levelup_lil" Instagram account.[42] The inquiry is whether the Affidavit demonstrates sufficient probable cause to evidence Dixon's connections to the Capital Park shootings and

---

[38] *Terreros*, 312 A.3d at 668, citing *Thomas v. State*, 305 A.3d 683 (Del. 2023).
[39] *Thomas*,305 A.3d at 701, quoting *Taylor v. State*, 360 A.2d 602, 617 (Del. 2021).
[40] *Thomas*, 305 A.3d at 703.
[41] *Id.*
[42] *Terreros*, 312 A.3d at 662.

that evidence of such would be found within the items requested.[43]  Although the January 29 warrant contains sufficient facts to establish a reasonable belief that 1) Dixon was an Instagram account user and 2) had involvement in those shootings, it does not contain sufficient facts to establish probable cause that evidence related to these shootings would be found within Dixon's Instagram messages.

The only information provided in the warrant regarding Dixon's Instagram account and its relation to the Capital Park shootings consisted of two separate Instagram posts on December 19, 2019, and December 28, 2019.[44]  Because the January 29 warrant appears to have been an attempt by Delaware State Police to consolidate warrants for multiple Instagram accounts into one, Dixon was not mentioned in this warrant until the Affiant's paragraph 24.  The only reference to Dixon's Instagram use in the entire warrant were found in Paragraphs 32 and 34.

Paragraph 32 stated that the account "levelup_lil" posted a video on December 19, 2019, containing several firearms.  A second video was posted by this account on December 28, 2019, which, according to the Affiant, showed Dixon taunting unknown shooters for missing him, in reference to a shooting that occurred at 242 Governor Boulevard, Dixon's address, the previous night.  Paragraph 18 of the

---

[43] *Id.*
[44] D.I. 136, Ex. A ¶¶ 32, 34.

Affidavit referenced facts surrounding that shooting. The totality of the Affidavit laid out sufficient probable cause to connect the shootings.

But the Affidavit does not establish probable cause to believe that evidence of these shootings would be found in Dixon's Instagram messaging. While paragraph 34 of the Affidavit referenced Dixon's Instagram messaging, it failed to provide sufficient information to establish the required nexus. This paragraph reads:

> On 1/28/20, your affiant contacted Detective Warren of the Dover Police Department. Detective Warren is investigating an unrelated homicide which occurred on 1/24/20. [Victim] was located deceased within the city of Dover, DE [sic] due to being shot. Detective Warren advised he had gone through the content of [the victim's] phone and located Instagram messages from user "levelup_lil".[sic][45]

This is the entirety of any reference to Instagram messaging for the "levelup_lil" account. No further detail was provided into the substance of the messages, nor was a timeframe provided for when these messages were exchanged. This information is insufficient to establish a nexus, by a probable cause standard, to obtain "[r]ecords concerning the content of private messages in the user's inbox, draft, and sent messages, for the above listed account(s)" as requested in Item 5. Therefore, any results provided in response to this request are suppressed and the motion is **GRANTED, in part**, with respect to this section of the warrant.

---

[45] D.I. 127, Warrant Application, ¶ 34.

This warrant additionally fails to provide any information whatsoever regarding the request in Item 4 for "[r]ecords concerning the IP address at account sign-up, logs showing IP addresses with date and time stamps for the above listed account(s)." The Affidavit failed to show how this information would be relevant, necessary, or much less provide evidence of the investigated crimes. Therefore, the motion to suppress is **GRANTED, in part**, with respect to this section of the warrant. As a result, the Motion to Suppress the March and May warrants is **GRANTED**, as the probable cause in those warrants was grounded upon the information obtained from the Instagram private messaging received from the January warrant.

The motion is **DENIED**, however with respect to Items 1-3, as these Items logically request information regarding the Instagram account for which probable cause exists. The nexus was established based upon the nature of the requests themselves. The information provided in the warrant established the nexus for the sought identification information of the potential shooting suspects, one of which was Dixon.

### 2. The March 2021 AT&T Warrant

Dixon next challenges the issuance of a search warrant directed at the AT&T telephone number (302) 608-4874, a number presumed to be Dixon's. This warrant requested:

…Call Detail Records (CDRs)[46] … for the time period February 25, 2020 from 0001 hours to February 26, 2020, 0001 hours (EST/UTC-5) and March 2, 2020 from 0001 hours to 2359 (EST/UTC-5) on the AT&T network by way of AT&T USA.

1. All subscriber information, including name, address, contact numbers, activation/deactivation dates, account number, social security number and account features
2. All device identifies, to include ESN, MEID, IMEI, and IMSI
3. Cell Site locations (tower lists, tower addresses, latitude, longitude) and sectors for all outgoing and incoming voice, SMS, MMS and data transactions
4. All available RTT (Real Time Tool), PCMD (Per Call Measurement Data), NELOS (Network Event Location System), TDOA or Timing Advance Information (True Call), Mediation records, E911 records, and any other historical GPS, CSLI (Cell Site Location Information), or records for any other methods of historical precision location data, to include 1X, EVDO, LTE and data
5. IP Session and IP Source-Destination reports
6. All Text message content to include pictures OR provide the Cloud account which stores this content
7. Devise identifiers, such as IMEI, for all devices (watches, HUM, tablets, etc) that are connected/paired to this number/subscriber account[47]

Paragraph 40 of the warrant's Affidavit states:

Your Affiant seeks to obtain the cell tower data and related information in order to confirm the locations of Khalil Dixon's cellular device in the timeframe before, during and after the homicide of Shiheem Dirham. Specifically, Your Affiants seek to determine if Robinson's cell phone was in the area of the crime scene and/or in the Capital Park

---

[46] Hereinafter, Call Detail Records will be referred to as "CDRs."
[47] D.I. 128, Warrant Application, p. 4.  Again, the Court recited this language verbatim and is not correcting grammatical errors.

neighborhood following the homicide on February 25, 2020. Moreover, Your Affiants also seek to determine Dixon's whereabout on March 2, 202 to determine if he was at the Dover Mall. Your Affiants are requesting the cell tower data for the following timeframes: February 25, 2020 from 0001 hours to February 26, 2020 0001 hours (EST/UTC-5) and March 2, 2020 from 0001 hours to 2359 hours (EST/UTC-5).[48]

Dixon first argues this request amounts to an unconstitutional general warrant and therefore, any evidence obtained must be suppressed. Dixon's argument is based upon the "mismatch between the limited probable cause that may be averred in a search warrant affidavit, and far broader search parameters approved in the warrant."[49] Dixon argues the warrant sought much more than the cell tower location, and that the text message data requested is not supported by probable cause. Dixon additionally argues the warrant lacks probable cause to establish a connection between Dixon's cell location information and the alleged crime, as well as failing to place temporal limitations on Items 1-7. Dixon points out that the Affidavit's paragraph 40 seemingly seeks records of another, "Robinson," as opposed to Dixon himself.

In retort, the State argues that the warrant is not general, due to the temporal limitations provided and the contents sought do not amount to an "exploratory rummaging" of Dixon's account information. The State argues the reasoning in

---

[48] *Id.*, ¶ 40.
[49] D.I. 128, ¶ 9.

15

*Terreros, Buckham,* and *Wheeler* do not implicate the same privacy here, as the information sought is cell tower data, rather than that of a privately owned cellular device. Additionally, the State argues the Affidavit sufficiently established probable cause and a nexus between the phone and the crime scene for the CDR, as well as for the additional items requested. Alternatively, the State acknowledges the insufficiencies in the additionally requested items and argued, at most, the Court should find this warrant overbroad and simply suppress the requested additional materials, none of which were provided by AT&T. Finally, the State argues that the mention of "Robinson" as opposed to "Dixon" in paragraph 40 is akin to a scrivener's error and does not negate the validity of the warrant, as the remainder of the affidavit makes the intentions clear.

First and foremost, it is incumbent upon the Court to acknowledge and express distaste with the sloppiness that has been shown in the drafting of not only this warrant, but the other warrants reviewed in this case. The mentioning of "Robinson" in paragraph 40 is seemingly the tip of the iceberg of the poor quality of these warrants in an important investigation. Whether these warrants were a result of rushing, complacency, or general sloppiness, more is expected in the presentation and drafting of these warrants. While the State is correct that in two recent cases the Superior Court has found that errors in warrants did not result in the suppression of

16

evidence,[50] those were case specific findings and should not be routinely relied upon to excuse sloppy warrants. Attention to detail is required when drafting and presenting warrants.

In *Buckham v. State*, the Supreme Court declared a search warrant of Buckham's cell phone unconstitutionally general for lack of particularity. Specifically, the Court's decision cited the warrant's failure to limit the search to a particularized time frame and found it authorized a search of essentially all data on the device.[51] The Court determined that the warrant application failed to establish the requisite probable cause as the warrant was "too vague and too general to connect [the defendant's] cell phone to the shooting."[52] The open-ended language used in the *Buckham* warrant, in conjunction with the lack of any limiting time frame, amounted to an impermissible general warrant, violative of the Fourth Amendment.[53]

Similarly in *Terreros*, the Supreme Court found the cell phone search warrant in question improperly authorized a search of "nearly every major category of data contained within the phone without regard to date."[54] The *Terreros* Court reaffirmed that a warrant must contain explicit language to ensure its practical effect will only

---

[50] *State v. Martin*, 2023 WL 4077677, *7 (Del. Super. June 16, 2023) and *State v. Brown*, 2024 WL 913199, at *3 (De. Super. Mar. 1, 2024).
[51] *Buckham*, 185 A.3d at 19.
[52] *Id*, at 17.
[53] *Id.*, see also *Thomas v. State*, 305 A.3d at 701.
[54] *Terreros*, 312 A.3d at 670.

allow law enforcement to search areas in which there is a sufficient nexus, established by probable cause, to the investigation.[55] An affidavit of probable cause must establish a nexus and provide "facts sufficient to conclude that any evidence of the alleged crime would be found" in the places to be searched.[56] A general warrant essentially allows law enforcement an indiscriminate search of the entire electronical data.[57] Even where identifiable categories are set forth, if the collective result is a search of essentially the entire contents, or a "top to bottom rummaging" of all of the electronically stored information, the warrant is general and must be suppressed in its entirety.[58]

The State's argument that *Terreros* and *Buckham* are inapplicable because those cases dealt with the search of a personal cellular phone, as opposed to information held by a third-party company, is somewhat misplaced. Yes, different privacy implications are at play when searching a personal cellular device as opposed to cell tower location information. However, privacy concerns remain with cellular tower information.[59] And while the decisions in *Terreros* and *Buckham* speak to warrants for personal electronic devices, they provide a detailed analysis for review of all warrants, as all warrants have the potential to be challenged as

---

[55] *Id.* at 666, 667, *see also Thomas v. State*, 305 A.3d 683, 697 (Del. 2023).
[56] *Id.* at 667.
[57] *Id.*
[58] *Id.*
[59] *See Buckham*, 134 A.3d at 1 (Del. 2018).

general or overbroad. The type of privacy interest protected, i.e. personal device or records held by a third party, is just one part of the analysis. While the individualized holdings are fact dependent, the principles that are provided in those cases can be applicable to search warrant drafting and review for all scenarios.[60]

With that understanding, the AT&T warrant was reviewed to determine whether it is an unconstitutional general warrant. It is not. The warrant contained the temporal limitation that was lacking in *Buckham*. There is no question this warrant was poorly drafted; had more thought and review been given to this warrant, this discussion may not have been needed. However, a fair reading of the warrant makes it clear that the temporal limitation in the CDR request applies to the additional Items 1-7. Thus, drawing the reasonable inference permitted, the warrant provides a temporal limitation for all information requested.[61] This inference is supported by the fact that AT&T did not provide any information beyond those dates.

This warrant differs from the general warrants discussed in the cited cases, as it did not permit an indiscriminate search or "exploratory rummaging" through the details of Dixon's cellular account. While this warrant haphazardly set forth a temporal limitation, it described with particularity the places to be searched and did

---

[60] Notably, the State cites *Thomas* in support of its alternative argument seeking an overbroad determination, which also reviewed a warrant requesting an information from a cellular phone.
[61] *Sisson*, 903 A.2d at 296 (internal citations omitted).

not request information that amounted to a top-to-bottom search of Dixon's information. Therefore, the AT&T warrant is not an unconstitutional general warrant.

However, the warrant is overbroad.[62] Dixon correctly claims that "the approved warrant authorized collection of much more, including, for example, 'all text message content to include pictures or provide the Cloud account which stores this content'- a far broader sweep for records than the cell tower data search for which probable cause had been averred in the Affidavit."[63] While the warrant delineated specified areas of the search, not all requests were supported by probable cause.[64]

The warrant established a nexus between the requested CDRs, the time frame, and evidence of the alleged crime. Much of the Affidavit details discussion between alleged conspirators regarding the murder of Durham from cellular devices. The device number was attributed to Dixon and electronic communications were included that established the device was used. The Affidavit contained evidence regarding phone use, Dixon's location regarding the set up and final payment for the murder, and the relationship between the evidence and the Durham's murder. This

---

[62] *Terreros*, 312 A.3d at 668 (internal citations omitted).
[63] D.I 128, Def.'s Mot. to Suppress Instagram Search Warrants, ¶ 10.
[64] *Thomas*, 305 A.3d at 703.

distinguishes it from infirmities in the general warrants previously discussed, where such a nexus could not be established.

In reviewing the totality of the information presented in the entirety of the warrant, requested Items 1-4 are founded in probable cause. The purpose of this warrant was to request cell tower information. That was confirmed in paragraph 40, albeit for Dixon and not Robinson. The need for subscriber and contact information was set forth and a nexus is established, thus Item 1 passes constitutional muster. The same logic follows for Item 2, which requested "[a]ll device identifiers." The Affidavit established a nexus and probable cause for cell tower location, and naturally device identifiers stem from that request.

The descriptions themselves in Items 3 & 4 established sufficient identifying information that allows this Court to conclude that these requests would lead to the discovery of cell tower location information for Dixon's purported number. Despite the Affidavit itself not having defined these technological terms, support is found in Items 3 & 4 by reading the totality of the information provided in the Affidavit (paragraph 2 of the "Affiant and Witness" section),[65] along with paragraphs 20, 26, 27 and 40 of the Affidavit, in conjunction with the request for "[a]ll cell site tower location information for cell phone (302) 608-4874" written atop each page of the Affidavit. As such, with respect to these items, the motion to suppress is **DENIED**.

---

[65] D.I. 128, Warrant ¶¶1-3.

21

However, this warrant lacks probable cause to establish a nexus that evidence of the murder would be found in requested items 5 through 7. Item 5 requests "IP Session and IP Source-Destination reports" however the warrant is completely devoid of information to explain this request or why this information would hold evidence of the murder of Durham and Dixon's involvement. If this information is needed to provide "cell site tower location information," it should have been articulated in the warrant. It was not. Therefore, this request is stricken as impermissibly overbroad and to the extent evidence was received from AT&T in response of this request, it is suppressed.

Further, there is nothing in the warrant that established probable cause for either Item 6 or 7. Item 6 requested, "[a]ll text message content to include pictures OR provide the Cloud account which stores this content." Item 7 requested, "[d]evice identifies, such as IMEI, for all devices (watches, HUM, tablets, etc) that are connected/paired to this number/subscriber account." Once again, there is nothing remotely mentioned in this warrant that could establish probable cause for these requests. No mention of a watch or tablet is found in the Affidavit. To the extent the Affidavit referenced electronic communications between Dixon and others, those were made in reference to a social media account. The Affidavit did not contain any language that connected this requested information to the cell tower location data. Therefore, Items 6 & 7 are impermissibly overbroad, unsupported by

22

probable cause and any information received as a result of these requests are suppressed.

The State's argument that no privacy intrusion occurred because no items were produced in response to the overbroad language is incorrect. The fact that nothing was produced in response to this subpoena is of no consequence. It is the search itself, as opposed to the result, that is the focus of the Court's review.[66] A constitutional violation cannot be cured by the fact that no evidence was returned. It is the search that is the intrusion. Not the results.[67]

It is notable that all the warrants at issue in this case were all sought and reviewed in 2020 and 2021, prior to the instructive rulings provided in *Terreros* and *Thomas*. Issues with the attention to the drafting of these warrants aside, the concepts of general versus overbroad warrants have recently been articulated by the Supreme Court in these cases, which provided helpful guidance to reviewing courts. Therefore, with respect to Dixon's motion to suppress the March 24, 2021, warrant seeking information related to (302) 608-4874, the motion is **GRANTED in part** and **DENIED in part.**

---

[66] *Terreros*, 312 A.3d at 670.
[67] *Id.*

23

### 3. The March 19, 2021, Instagram Warrant

Dixon challenges the issuance of the March 19, 2021, Instagram warrant as an unconstitutional general warrant. Once again, the State argues that *Terreros*, *Taylor* and *Thomas* – all cited by Dixon, are inapplicable for the reasons previously discussed. The State additionally argues that *Coffield v. State*,[68] distinguishes these warrants from those of *Terreros*, *Taylor* and *Thomas*.

The State is correct that *Coffield* upheld an Instagram search warrant in part by distinguishing *Terreros*, *Taylor* and *Thomas* on the basis that different privacy implications exist when searching a personal device rather than information received from a third-party provider. However, *Coffield* endeavored the same review regarding particularity and temporal limitations. Again, the privacy interest is a factor in the constitutional analysis. It is not determinative of whether such an analysis needs to occur.

Nevertheless, the March 19, 2021, Instagram warrant used here is essentially the same as the one presented for review in *Coffield*.[69] The language used in the "Greetings" page of the *Coffield* warrant is the exact language used in the March 19, 2021, warrant challenged here. The only difference is that this warrant naturally

---

[68] *Coffield v. State*, 333 A.3d 491(TABLE) (Del. 2025), 2025 WL 85345.
[69] *Id*. *See also Coffield v. State*, No. 288, 2023, D.I. 60, State Reply App. B42.

speaks to Dixon and the time frame relevant in this case. Dixon's warrant places the temporal limitation of January 29, 2020, to March 17, 2020.

Dixon acknowledges the warrant is based upon probable cause and states his challenge extends only to the argument that it is an impermissible general warrant due to the language used. From the Court's review of the accompanying Affidavit, the warrant is based upon probable cause and a sufficient nexus exists to justify each search request. Given this, and following the logic delineated in *Coffield*, the warrant is constitutionally sufficient. The late-filed motion to suppress is therefore **DENIED**.

## II. Motion *in Limine* to Exclude Shute Testimony

Finally, Dixon moves *in limine* to exclude the testimony of the State's proffered expert William Shute, retired Special Agent, who founded the FBI's Cellular Analysis Survey Team (hereinafter "C.A.S.T.") Unit. An evidentiary hearing was held on November 10, 2025, at which testimony was taken by Shute. For the reasons set forth below, that motion is **DENIED**.

After receiving the Call Detail Records received from the AT&T warrant, the State requested former FBI Special Agent William Shute (hereinafter "Shute") analyze the CDRs to determine the approximate location of Dixon's cell phone on the requested dates by locating the cell towers to which it connected. In Dixon's first trial, the State presented Shute's testimony to argue Dixon was in Dover on the

25

date of the murder and on March 2, 2020, to make the final payment for the murder.[70] The State's theory is that Dixon arranged the murder for hire scheme and coordinated with Deonte Robinson (hereinafter "Robinson") and Calhum to kill Durham. Dixon paid in two installments, both in person, in Dover.

The State presented cell tower record evidence through Shute from the date of the murder that placed Dixon, Calhum, and Robinson all within the cell tower sectors that covered a shopping center on South Bay Road in Dover, near the scene of the crime.[71] Call detail records from March 2, 2020, show Dixon and a witness, Tyree Burton (hereinafter "Burton") called each other several times up until 12:49 p.m. At the same time, Burton's Probation & Parole GPS records placed him at the Dover Mall while Dixon's cell tower records placed him in the corresponding tower sector that covers the Dover Mall.[72] After the murder, Robinson collected a partial cash payment from Dixon at a nearby store.[73] Dixon paid Robinson the remaining cash balance when they met at the Dover Mall several days later.[74] Shute's testimony placed Dixon's phone at each location nearby given the cell tower coordinates.

---

[70] D.I. 137 at 2.
[71] *Id.* at 3.
[72] *Id.*
[73] *Id.* at 4.
[74] *Id.*

The State seeks to reintroduce this testimony in Dixon's new trial. Shute's testimony is now challenged by Dixon, despite it being admitted without objection in the first trial. Dixon argues that since his conviction, the New Jersey Superior Court, Appellate Division, decided *State v. Demby*.[75] *Demby* found information obtained from AT&T towers to determine location information to lack reliability because AT&T does not provide Real Time Tracking information.[76] Dixon urges this Court to follow the same analysis and exclude Shute's testimony in his new trial. The State argues that *Demby* was founded on incorrect reasoning and is not binding on this Court. The State further argues that under Delaware jurisprudence and the Delaware Rules of Evidence, the proffered testimony of Shute satisfies all requirements and should be re-admitted.

In Delaware the admissibility of expert testimony is determined using the *Daubert*[77] standard. Under this standard, the Court asks whether:

> (i) the witness is "qualified as an expert by knowledge, skill, experience, training or education; (ii) the evidence is relevant and reliable; (iii) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (iv) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and (v) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[78]

---

[75] *State v. Demby*, 2024 WL 3039795 (N.J. Super. Ct. App. Div. June 18, 2024).

[76] *Id.* at *5-6.

[77] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 (1993).

[78] *State v. Pierce*, 222 A.3d 582, 588 (Del. Super. Mar. 6, 2019) (citing *Eskin v. Carden*, 842 A.2d 1222, 1231 (Del. 2004) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 113).

As the gatekeeper, the trial judge's role "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[79]

Dixon contends that "Agent Schute's report relies upon assumptions that have no basis in fact and is unsupported by the necessary empirical data, given the lack of True Call data, the absence of drive testing, and the failure to determine the actual coverage footprints of the relevant AT&T cell towers."[80] Consequently, Dixon claims that the proffered expert testimony will not assist the trier of fact and carries a high risk of prejudice which may mislead the jury.[81]

Dixon solely relies on New Jersey's *Demby* decision for his proposition that because AT&T towers do not have Real Time Tracking ("RTT") technology, Agent Schute's testimony is essentially his opinion and cannot be presented to the jury. Dixon's reliance on *Demby*, however, is misplaced. New Jersey and Delaware have different standards for admission of expert testimony. New Jersey follows a judicially created "net opinion" standard, which prohibits a witness testifying as an expert if the testimony is not factually supported. This is different from Delaware's

[79] *Pierce*, 222 A.3d at 588.
[80] D.I. 146, Def. Mot. in Lim. to Exclude CAST Expert William Shute ¶ 2.
[81] *Id.* at ¶¶ 8-9.

standard for admission of this evidence, which is governed by Delaware Rule of

Evidence ("D.R.E") 702. D.R.E. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[82]

A hearing was held following argument on Dixon's motion at which Shute

testified to his training, experience and reasoning for his opinions in this case.

Notably, Shute has provided expert testimony in numerous cases in both Delaware

and Pennsylvania courts, including testimony during Dixon's first trial. While there

is no written opinion in Delaware regarding Shute's expert designation, the Superior

Court of Pennsylvania has previously ruled that Shute was an expert in the field of

historical cellular site analytics.[83] In *Commonwealth. v. Page*, the court held Shute

was qualified to provide testimony in this field, as "Shute received specialized

training in the field of cellular technology from the FBI and from outside

companies," which "included, but is not limited to, GSN technology, CDMA

---

[82] D.R.E. 702.
[83] *Page*, 2014 WL 10965747 at *22.

technology, IDEN technology and radio frequency theory."[84] *Page* concluded that "Shute has extensive experience (1) working with commercial cellular telephone carriers; (2) analyzing historical cell site data; and (3) with the operation of handset technology within cell phone towers and the larger cellular network."[85] The court ultimately held that "[g]iven Special Agent Shute's experience, training, specialized knowledge and professional qualifications, [the Court] had no reservations in recognizing Special Agent Shute as an expert in the area of historical cell site analysis."[86]

The same conclusions can be made following the hearing before this Court. Shute testified to his extensive training and experience, that he essentially created the C.A.S.T. Unit within the FBI and has extensive knowledge regarding the technology surrounding his review of cellular data and information provided by cellular providers dating back decades. Shute testified to the R.T.T. technology, when it became available, how it can assist when it is provided, and that whether this R.T.T. technology is available does not alter the reliability of his conclusions.

In reviewing the standards under D.R.E. 702, Shute's testimony regarding Dixon's cell phone location will assist the trier of fact to understand the evidence presented to determine whether Dixon was in Dover at the relevant times. The

---

[84] *Id.*
[85] *Id.*
[86] *Id.*

proffered testimony is based upon sufficient facts and data, is the product of reliable principles and methods, and is not based upon Shute's opinion alone. Shute has reliably applied the principles and methods of cellular analysis to the facts of this case. His conclusions are based upon information and methods relied upon by experts in the field of cellular analysis.

With all due respect to the *Demby* Court, the New Jersey standard of admission for expert testimony differs from the Delaware standard. After hearing thorough testimony regarding the scientific basis for the opinions in which Shute holds, a reliable basis for Shute's testimony has been established. The absence of R.T.T. information provided by AT&T does not change Shute's qualifications or the reliability of his opinion. Shute has been analyzing data and providing expert opinions to this Court and others before the emergence of this R.T.T. technology. This proffered testimony proves to be no less reliable. A technological advancement offered by some cellular providers should not serve as an impediment to the admission of previously reliable testimony.

Therefore, the Motion *in Limine* to exclude Shute's testimony is **DENIED**.

## III. Conclusion

Therefore, the Motion to Suppress the January 29, March 30 and May13, 2020 Instagram Warrants is **GRANTED, in part** and **DENIED, in part.** The Motion to Suppress the AT&T Warrant is **GRANTED, in part** and **DENIED, in part**. The

Motion for Leave to File Out of Time is **GRANTED**, but the corresponding Motion

to Suppress is **DENIED.**  Finally, the Motion *in Limine* is **DENIED.**

    **IT IS SO ORDERED.**

_____
Danielle J. Brennan, Judge